[No. B231634. Second Dist., Div. One. Apr. 17, 2012.]

AMIR PELEG, Plaintiff and Appellant, v.
NEIMAN MARCUS GROUP, INC., Defendant and Respondent.

1432

COUNSEL

Shegerian & Associates and Carney R. Shegerian for Plaintiff and Appellant.

Jackson Lewis, Theresa M. Marchlewski and Sherry L. Swieca for Defendant and Respondent.

OPINION

MALLANO, P. J.—Under the Federal Arbitration Act (FAA) (9 U.S.C. §§ 1–16), "arbitration is a matter of contract." (*Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 582 [4 L.Ed.2d 1409, 80 S.Ct. 1347]; accord, 9 U.S.C. § 2.) An arbitration contract typically consists of the parties' mutual promises to arbitrate their claims against each other.

In this employment case, an employer and its at-will employees purportedly entered into a contract requiring the arbitration of claims by both sides. But the contract contains a modification provision stating that the employer may amend, modify, or revoke the arbitration contract on 30 days' written notice; at the end of the 30-day period, a contract change applies to any claim

that has not been filed with the American Arbitration Association (AAA). The contract also has a choice-of-law clause stating that the contract shall be governed by Texas law and the FAA. The employee contends that, under the choice-of-law clause, the employer's unilateral right to make contract changes renders the contract illusory. We ultimately conclude that the choice-of-law clause is valid and that the arbitration contract is illusory under Texas law.

In reaching that conclusion, we also examine California law regarding illusory arbitration contracts. On that subject, we determine that an arbitration contract containing a modification provision is illusory if an amendment, modification, or revocation—a contract change—applies to claims that have accrued or are known to the employer. If a modification provision is restricted—by express language or by terms implied under the covenant of good faith and fair dealing—so that it exempts *all* claims, accrued or known, from a contract change, the arbitration contract is not illusory. Were it otherwise, the employer could amend the contract in anticipation of a specific claim, altering the arbitration process to the employee's detriment and making it more likely the employer would prevail. The employer could also terminate the arbitration contract altogether, opting for a judicial forum if that seemed beneficial to the company.

# I

## BACKGROUND

The allegations and evidence in this appeal are taken from the pleadings as well as the declarations and exhibits submitted in connection with the motion to compel arbitration and the subsequent cross-motions to vacate and confirm the arbitration award.

### A. *Complaint*

The complaint alleges that plaintiff, Amir Peleg, is a gay Jewish male of Israeli national origin. He worked at the Neiman Marcus store in Beverly Hills from December 28, 2005, to February 21, 2008. The store is owned by defendant Neiman Marcus Group, Inc. (Neiman Marcus). Peleg's supervisor was an Iranian woman of the Muslim religious faith.

Peleg worked in the fragrances department and performed his duties in an exemplary manner.

On February 21, 2008, Peleg was discharged because of his national origin, religion, and sexual orientation in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12900–12996). He was also

harassed and subjected to retaliation for the same reasons. He exhausted his administrative remedies under the FEHA and received a right-to-sue letter. (See Gov. Code, §§ 12960, 12963, 12965, subd. (b).) In addition, his discharge violated an implied-in-fact contract requiring good cause for termination and was contrary to public policy in that the discharge was motivated by his complaints about compensation issues and his disclosure of Neiman Marcus's failure to comply with state and federal laws. Finally, Neiman Marcus falsely stated it had discharged Peleg because he stole samples from the store.

The complaint, filed on October 16, 2008, contained causes of action, alleging violations of the FEHA, breach of an implied-in-fact contract requiring good cause for termination, wrongful termination in violation of public policy, and defamation.

### B. *Motion to Compel Arbitration*

Neiman Marcus responded to the complaint with a motion to compel arbitration of the entire case. The company established that, at the time of hire, Peleg was given a "Mandatory Arbitration Agreement" (Agreement). Over a year later, he signed a form acknowledging (1) he had received the Agreement and had an opportunity to review it, (2) he understood that he and the company had to submit all disputes to binding arbitration, and (3) the Agreement was a mandatory condition of employment.

The first three pages of the Agreement indicate that the parties agreed to arbitrate "claims" against each other.

The Agreement defines "Covered Employees" as "[a]ll employees of the Company who are employed by the Company on or after the Effective Date [of July 15, 2007], and all employees who accept employment on or after the Effective Date . . . . [T]his Agreement does not cover employees who have their own separately signed employment agreement with the Company."

On page 1, the Agreement recites: "The following are the terms and conditions of this Agreement. [¶] . . . [¶] . . . All 'Claims' described *in Section 3 below* that any Covered Employee may have against the Company shall be resolved **exclusively** through final and binding arbitration . . . . [¶] . . . All 'Claims' described *in Section 3 below* that the Company may have against any Covered Employee shall be resolved **exclusively** through final and binding arbitration . . . ." (Italics added.)

Section 3, which appears on pages 2 and 3, sets forth a list of "Covered Claims." Those claims are divided into 10 general categories and include the

names of specific statutes where pertinent, as follows: (1) "Discrimination or harassment on the basis of race, color, gender, sexual orientation, religion, national origin, age, disability, or any other unlawful basis," citing, among other laws, the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§ 621–634), title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e-4), the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101–12117), and the Family and Medical Leave Act of 1993 (29 U.S.C. §§ 2601–2654); (2) "Violations of any common law or constitutional provision, federal, state, county, municipal, or other governmental statute, ordinance, regulation, or public policy relating to workplace health and safety, voting, meal or rest breaks, state service letters, and [wage and hour issues]"; (3) "Violations of any common law or constitutional provision, federal, state, county, municipal, or other governmental statute, ordinance, regulation, or public policy, including, but not limited to, claims alleged under the following statutes: . . . Employee Polygraph Protection Act of 1988 [(29 U.S.C. §§ 2001–2009)]; Employee Retirement Income Security Act of 1974 [(29 U.S.C. §§ 1001–1461)]; Fair Credit Reporting Act [(15 U.S.C. §§ 1681–1681x)]; . . . The Occupational Safety and Health Act [of 1970 (29 U.S.C. §§ 651–678)]; . . . and Worker Adjustment and Retraining Notification Act [(29 U.S.C. §§ 2101–2109)]"; (4) "Personal injuries except those covered by workers' compensation"; (5) "Retaliation for filing a protected claim for benefits . . . or exercising rights under any statute"; (6) "Breach of any express or implied contract, breach of a covenant of good faith and fair dealing, and claims of wrongful termination or constructive discharge"; (7) "Breach of any common law duty of loyalty or its equivalent"; (8) "Exceptions to the employment-at-will doctrine"; (9) "Any common law tort claim, including, but not limited to, wrongful discharge, malicious prosecution, wrongful arrest/wrongful imprisonment, negligence, gross negligence, defamation, slander, fraud, misrepresentation, invasion of privacy, tortious interference, trespass to chattel, conversion, negligent and intentional infliction of emotional distress, or 'whistleblowing' "; and (10) "All other employment-related legal disputes, controversies, or claims arising out of, concerning, or relating in any way to, employment or cessation of employment with the Company."

A choice-of-law clause, in section 16, states that the Agreement is to be governed by Texas law and the FAA.

Section 20 of the Agreement declares: "This Agreement is not, and shall not be construed to create, any contract of employment, express or implied, nor shall this Agreement be construed in any way to change the status of any Covered Employee from at-will status. The parties can each end the employment relationship with the other at anytime for any reason, with or without cause. The arbitrator has no authority to alter the at-will nature of any employee's employment with the Company."

The Agreement is 10 pages long and is not part of another document such as an employee handbook or manual. It is a stand-alone agreement that addresses only one subject: arbitration.

Peleg opposed the motion to compel arbitration, arguing that the Agreement was unconscionable based on several allegedly invalid provisions. In the alternative, he asserted the Agreement was illusory and unenforceable in light of the following provision: "This Agreement to arbitrate shall survive the termination of the employer-employee relationship between the Company and any Covered Employee, and shall apply to any covered Claim whether it arises or is asserted during or after termination of the Covered Employee's employment with the Company or the expiration of any benefit plan. This Agreement can be *amended, modified, or revoked in writing by the Company at anytime*, but only upon thirty (30) days' advance notice to the Covered Employee of that amendment, modification, or revocation. However, any amendment, modification, or revocation will have *no effect on any Claim that was filed for arbitration prior to the effective date* of such amendment, modification, or revocation." (Italics added.)

The motion to compel was heard on February 2, 2009. By order of the same date, the trial court granted the motion and stayed further judicial proceedings pending the outcome of arbitration.

C. *Arbitration Proceedings*

Under the Agreement, arbitration is to be administered by the AAA and conducted by one arbitrator. In accordance with the trial court's ruling, the case was so assigned. The arbitrator set the case for hearing from June 21 to June 23, 2010. At the request of Neiman Marcus, the parties agreed that the hearing would be rescheduled to begin on September 28, 2010. Thereafter, at Peleg's request, the parties agreed to reset the hearing to commence on October 19, 2010. In making his request, Peleg asserted that his attorney of record, Astineh Arakelian, was unavailable, and "she was the only one who knew the case."

One week before the October 19, 2010 hearing date, Peleg sought another continuance. Arakelian notified the arbitrator that her colleague, Carney Shegerian, was unavailable for the hearing due to back-to-back trials in Los Angeles Superior Court. Arakelian stated that Shegerian was the only attorney Peleg had "authorized" to represent him at the arbitration hearing. Arakelian had known about this scheduling conflict two weeks before she sought a continuance. Shegerian had not informed the superior court he had any conflict regarding the arbitration hearing. Neiman Marcus opposed the continuance.

The arbitrator denied the continuance, explaining that Shegerian had done virtually no work on the case and Arakelian had handled the arbitration herself. On the day of the hearing, Neiman Marcus appeared with its two attorneys of record and in-house counsel, ready to proceed. Arakelian appeared together with Peleg but stated she could not go forward because she was not authorized to represent Peleg at the hearing.

By order dated on or about November 4, 2010, the arbitrator dismissed the case with prejudice pursuant to AAA rules on the ground Peleg had failed to comply with an order, namely, to present his case at the hearing on October 19, 2010. Peleg moved for reconsideration, which was denied. By separate order dated December 18, 2010, the arbitrator awarded Neiman Marcus sanctions of $40,350.22 in attorney fees and expenses.

The parties filed cross-motions to vacate and confirm the award. Peleg argued the arbitrator had improperly denied a continuance (see Code Civ. Proc., § 1286.2, subd. (a)(5)) and lacked the authority to impose sanctions. Neiman Marcus argued to the contrary.

At the hearing on the motions, the trial court ruled that the arbitrator had not erred in denying the continuance. It granted the motion to confirm the award. A written order was filed to that effect. Peleg appealed.

## II

## DISCUSSION

We review de novo the trial court's order confirming an arbitration award. (See *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9 [36 Cal.Rptr.2d 581, 885 P.2d 994].) The pertinent facts are not in dispute.

On appeal, Peleg contends—as he did in opposing the motion to compel arbitration—that the Agreement is illusory because Neiman Marcus retained the unilateral right to amend, modify, or revoke it on 30 days' advance written notice, with the change to apply to any unfiled claim. We agree with that contention.

"[Peleg is] attacking the authority of the trial court to compel [him] to submit the matter to arbitration. An order to compel arbitration is an interlocutory order which is appealable only from the judgment confirming the arbitration award, or in certain exceptional situations is reviewable by writ of mandate. . . . 'A party does not waive his right to attack the order [compelling arbitration] by proceeding to arbitration; the order is reviewable

on appeal from a judgment confirming the award.' " (*United Firefighters of Los Angeles v. City of Los Angeles* (1991) 231 Cal.App.3d 1576, 1581–1582 [283 Cal.Rptr. 8], citations omitted.) "If a trial court compels arbitration . . . , the party resisting arbitration may seek review of the ruling on appeal from an order that confirms the award. . . . If the arbitration process is found to be invalid, the responsibility for a waste of resources would then lie with the trial court, not the litigant . . . .' . . . Thus, '[w]ith respect to an order compelling arbitration, the question is not *whether* an aggrieved party is entitled to appellate review, but *when*. . . . [N]o immediate, direct appeal lies from an order compelling arbitration. . . . But such an order is subject to review on appeal from the final judgment.' " (*Fagelbaum & Heller LLP v. Smylie* (2009) 174 Cal.App.4th 1351, 1359 [95 Cal.Rptr.3d 252], citations omitted.) " 'The rationale of this rule is that the order compelling arbitration is interlocutory in nature and works no hardship on the litigant because the party who objects to arbitration may win at the arbitration hearing, and if he does not, the issue is reviewable on appeal from the order of confirmation.' " (*Maddy v. Castle* (1976) 58 Cal.App.3d 716, 719–720 [130 Cal.Rptr. 160], disapproved on another point in *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 188 [151 Cal.Rptr. 837, 588 P.2d 1261].)

Under the FAA, "[a] written provision in any . . . *contract* evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a *contract*, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2, italics added.)

■ In general, an arbitration contract consists of the parties' mutual promises to arbitrate their claims against each other. (See, e.g., *Ticknor v. Choice Hotels Internat., Inc.* (9th Cir. 2001) 265 F.3d 931, 944; *Hull v. Norcom, Inc.* (11th Cir. 1985) 750 F.2d 1547, 1549–1551; *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.* (2d Cir. 1967) 372 F.2d 753, 758; *Clutts v. Dillard's, Inc.* (D.Kan. 2007) 484 F.Supp.2d 1222, 1224, fn. 1; *In re Odyssey Healthcare, Inc.* (Tex. 2010) 310 S.W.3d 419, 424 (*Odyssey Healthcare*).)

"Words of promise which by their terms make performance entirely optional with the 'promisor' . . . do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance."

(Rest.2d Contracts, § 2, com. e, p. 10; accord, *id.*, § 77, com. a, p. 195; 1 Corbin on Contracts (rev. ed. 1993) § 1.17, p. 47.) "One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance. This unlimited choice in effect destroys the promise and makes it illusory." (1 Williston on Contracts (4th ed. 2007) § 4:27, pp. 804–805, fns. omitted; accord, 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 230–231, pp. 264–266.)

## A. *Arbitral Claims*

As a preliminary matter, we must decide *who* should decide whether the Agreement is illusory. Neiman Marcus contends the arbitrator should decide that question. Peleg presses for a judicial determination.

This issue is comparable to determining (1) which claims, if any, are arbitrable—arbitrability—or (2) whether an agreement is unconscionable. Questions of this type are reserved for the court unless the parties clearly and unmistakably delegate them to the arbitrator. That did not happen here.

■ In discussing who—an arbitrator or a judge—decides arbitrability, the United States Supreme Court has explained: "We believe the answer to the 'who' question . . . is fairly simple. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter. . . . [¶] . . . [¶]

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts. . . . The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration. . . .

"This Court, however, has (as we just said) added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so. . . . In this manner the law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption. . . .

"But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, . . . one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter. . . . On the other hand, the former question—the 'who (primarily) should decide arbitrability' question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. . . . [G]iven the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943–945 [131 L.Ed.2d 985, 115 S.Ct. 1920], citations omitted.)

■ The court discussed this subject again in *Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79 [154 L.Ed.2d 491, 123 S.Ct. 588] (*Howsam*), saying: " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' . . . Although the Court has also long recognized and enforced a 'liberal federal policy favoring arbitration agreements,' . . . it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the '*question of arbitrability,*' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' . . .

"Linguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase 'question of arbitrability' has a far more limited scope. . . . The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

". . . [A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide. . . .

Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. . . .

"At the same time the Court has found the phrase 'question of arbitrability' *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus ' "procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide. . . . So, too, the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.' . . . [T]he Revised Uniform Arbitration Act of 2000 . . . , seeking to 'incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act],' states that an 'arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled.' . . . And the comments add that 'in the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.' " (*Howsam, supra*, 537 U.S. at pp. 83–85, citations & some italics omitted.)

In *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. \_\_\_ [177 L.Ed.2d 403, 130 S.Ct. 2772] (*Rent-A-Center*), the court held that the parties had clearly and unmistakably delegated the question of unconscionability to the arbitrator by agreeing to the following delegation provision: " '[T]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.' " (561 U.S. at p. \_\_\_ [130 S.Ct. at p. 2775].)

Neiman Marcus relies on a similar delegation provision, found in section 19: "Any dispute concerning this Agreement—the way it was formed, its applicability, meaning, scope, enforceability, or any claim that all or part of this Agreement is void or voidable—is subject to arbitration under this Agreement and shall be determined by the arbitrator."

Under *Howsam, supra*, 537 U.S. 79, Neiman Marcus has raised "a gateway dispute about whether the parties are bound by a given arbitration clause[, which is typically] . . . for a court to decide." (*Id.* at p. 84.) The dispute concerns an " 'issue[] of substantive arbitrability' "—presumptively to be decided by a judge—not " 'procedural arbitrability' " (such as time limits, notice, laches, and estoppel)—which is presumptively for the arbitrator to

resolve. (*Id.* at p. 85.) As *Howsam* also recognized, the parties may authorize the arbitrator to decide substantive gateway issues through clear and unmistakable evidence to that effect. (*Id.* at p. 83.)

We now turn to the language of the Agreement to determine whether the parties clearly and unmistakably agreed that an arbitrator, not a court, would decide the question of enforceability. Although the Agreement contains a choice-of-law clause adopting the law of Texas and the FAA (see pt. IIB., *post*), the parties did not mention either set of legal principles in discussing who should decide whether the Agreement is enforceable. We therefore apply California law by default. (See *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 469, fn. 7 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*); *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 916, fn. 3 [103 Cal.Rptr.2d 320, 15 P.3d 1071]; Rest.2d Conf. of Laws, § 136, com. h, p. 378.) And, in any event, the parties relied on California law in briefing the issue.

Unlike the circumstances in *Rent-A-Center, supra*, 561 U.S. ___ [130 S.Ct. 2772], the delegation provision here is not the only language in the Agreement that bears on who decides whether the Agreement is illusory. The Agreement's severability provision, in section 22, states in part: "If any *court* determines that this Agreement in its entirety shall not be *enforced*, such determination shall be effective only as to Covered Employees who reside in the state where such *court* is located, and not as to any other Covered Employees . . . ." (Italics added.) Yet, according to Neiman Marcus, the Agreement's delegation provision means that an arbitrator *always* determines *any* question concerning enforceability. The severability provision, however, recognizes that a court may decide the same issue.

We are not writing on a clean slate in the face of such a contradiction. In one case, the trial court ruled: " '[W]hether a particular arbitration agreement is unconscionable is a "gateway" issue that a court decides, rather than an arbitrator, unless the arbitration agreement at issue clearly reserves that decision for the arbitrator. The arbitration agreement here does not clearly provide that issues of enforceability are to be decided by the arbitrator. Instead, the agreement is inconsistent on that issue. On the one hand, it provides in relevant part that "interpretation or the enforceability of this arbitration agreement, including without limitation, its . . . voidability for any cause . . . shall be decided by the arbitrator." However, that same section of the agreement contains a severability provision in the event that "any provision of this arbitration agreement shall be determined by the arbitrator or *by any court* to be unenforceable. . . ." Thus, it acknowledges the possibility that enforceability issues will be decided, not by the arbitrator, but rather by the court. In the absence of a clear, consistent, and unambiguous

reservation of that issue to the arbitration, it is properly decided by the court.' " (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 891 [71 Cal.Rptr.3d 854] (*Baker*).)

The Court of Appeal affirmed, stating: "[T]he trial court found the arbitration agreement was ambiguous on the issue of whether arbitrability was to be determined by the arbitrator. In our independent judgment . . . , we agree with the trial court that although one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable. . . . [W]e conclude the arbitration agreement did not 'clearly and unmistakably' reserve to the arbitrator the issue of whether the arbitration agreement was enforceable." (*Baker, supra,* 159 Cal.App.4th at pp. 893–894, citation omitted.)

In *Parada v. Superior Court* (2009) 176 Cal.App.4th 1554 [98 Cal.Rptr.3d 743] (*Parada*), the arbitration agreement had a delegation provision stating, " 'The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between them or to the breach, termination, *enforcement,* interpretation or *validity* of this Agreement . . . shall be submitted to final and binding arbitration before [a panel of three arbitrators].' " (*Id.* at p. 1561, italics added; see *id.* at p. 1560.) But the agreement also contained a severability provision, which read, " '[I]n the event that any provision of this Agreement shall be determined *by a trier of fact of competent jurisdiction* to be unenforceable in any jurisdiction, such provision shall be unenforceable in that jurisdiction and the remainder of this Agreement shall remain binding upon the parties as if such provision was not contained herein.' " (*Id.* at p. 1566.) As *Parada* observed: "Use of the term 'trier of fact of competent jurisdiction' instead of 'arbitration panel' . . . suggests the trial court also may find a provision, including the arbitration provision, unenforceable. The arbitration provisions of the [Arbitration] Agreements, as the one in *Baker,* did not ' "clearly and unmistakably" reserve' . . . to the arbitration panel the issue whether those arbitration provisions were unenforceable." (*Parada,* at p. 1566, citation omitted.)

Last, in *Hartley v. Superior Court* (2011) 196 Cal.App.4th 1249 [127 Cal.Rptr.3d 174] (*Hartley*), the arbitration agreement contained a delegation provision authorizing the arbitrator to decide " 'all disputes, claims or controversies arising out of or relating to . . . the breach, termination, *enforcement,* interpretation or *validity* of this Agreement.' " (*Hartley,* at p. 1256, italics added.) The agreement also provided that arbitration would be conducted in accordance with JAMS rules, one of which stated, " 'Jurisdictional and arbitrability disputes, including disputes over the *formation, existence, validity,* interpretation or scope of the agreement under which Arbitration is sought, . . . shall be submitted to and ruled on by the Arbitrator."

(*Ibid.*, italics added.) The *Hartley* agreement, like the agreement in *Parada*, had a severability provision stating, " 'In the event that any provision of this Agreement shall be determined by a *trier of fact of competent jurisdiction* to be unenforceable in any jurisdiction, . . . the remainder of this Agreement shall remain binding. . . .' " (*Hartley*, at p. 1257.)

*Hartley* pointed out that the " 'clear and unmistakable' " test in *Rent-A-Center* required a " 'heightened standard' " of proof. (*Hartley, supra*, 196 Cal.App.4th at p. 1254.) Applying that test, *Hartley* concluded: "Here . . . the [arbitration] agreements do not meet the heightened standard that must be satisfied to vary from the general rule that the court decides the gateway issue of arbitrability. The severability clause here uses the term 'trier of fact of competent jurisdiction,' rather than the term 'arbitrator,' indicating the court has authority to decide whether an arbitration provision is unenforceable. As in *Parada*, ' "although one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable." ' . . . When an agreement is ambiguous, 'the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide.' . . . We construe ambiguities against . . . the drafting party. . . . [¶] We conclude [the plaintiff] is entitled to a *judicial* declaration of whether the arbitration clause is [enforceable] . . . ." (*Hartley, supra*, 196 Cal.App.4th at pp. 1257–1258, citations omitted, italics added.)

The Court of Appeal went on to explain: "In *Rent-A-Center*, [*supra*, 561 U.S. ___ [130 S.Ct. 2772]], . . . there was no question that the parties had delegated gateway issues of arbitrability exclusively to the arbitrator. The court held that under that scenario, the court could not hear an issue of arbitrability unless there was a specific challenge to the delegation clause of the arbitration agreement, as opposed to a general challenge to the entire arbitration agreement. . . . *Rent-A-Center* does not involve a contract that, as here, contains conflicting and ambiguous provisions on who is to decide the issue of arbitrability. *Rent-A-Center* cautioned that ' "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistabl[e]' evidence that they did so." ' " (*Hartley, supra*, 196 Cal.App.4th at p. 1261, citation omitted.)

Consistent with *Baker*, *Parada*, and *Hartley*, we conclude the inconsistency between the Agreement's delegation and severability provisions indicates the parties did not clearly and unmistakably delegate enforceability questions to the arbitrator. The delegation provision states that the arbitrator is to decide whether the Agreement is enforceable while the severability

provision contemplates that a court has the same authority. The Agreement does not explain when an arbitrator, as opposed to a court, is to decide enforceability.

■ In sum, the Agreement's statement in the severability provision that a *court* may decide the question of enforceability creates an ambiguity as to whether an arbitrator should decide if an arbitration contract is enforceable. "[Neiman Marcus] cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it. . . . [The company] drafted an ambiguous document, and [it] cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 62–63 & fn. 10 [131 L.Ed.2d 76, 115 S.Ct. 1212], citations & fn. omitted; accord, *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.* (2001) 532 U.S. 411, 423 [149 L.Ed.2d 623, 121 S.Ct. 1589]; *Ford v. NYLCare Health Plans of Gulf Coast, Inc.* (5th Cir. 1998) 141 F.3d 243, 249–250.) ■ Under *Rent-A-Center, supra,* 561 U.S. ___ [130 S.Ct. 2772], the parties must clearly and unmistakably agree that the arbitrator will decide whether the agreement is enforceable (*id.* at p. ___, fn. 1 [130 S.Ct. at p. 2777, fn. 1]). Ambiguous language, which we have here, does not suffice.

Accordingly, a court may resolve the question of whether the Agreement is illusory.

B. *Choice of Law*

Section 16 of the Agreement provides: "*This Agreement* shall be construed, *governed by,* and enforced in accordance with *the laws of the State of Texas* (except where specifically stated otherwise herein), except that for claims or defenses arising under federal law, the arbitrator shall follow the substantive law as set forth by the United States Supreme Court and the United States Court of Appeals for the Fifth Circuit. The arbitrator does not have the authority to enlarge, add to, subtract from, disregard, or . . . otherwise alter the parties' rights under such laws, except to the extent set forth herein. The parties recognize that the Company operates in many states in interstate commerce. Therefore, it is acknowledged and agreed that *the Federal Arbitration Act,* 9 U.S.C. § 1, et seq., shall *govern this Agreement* and the arbitration." (Italics added, boldface omitted.)

"The phrase 'governed by' is a broad one signifying a relationship of absolute direction, control, and restraint. . . . [T]he [choice-of-law] clause reflects the parties' clear contemplation that 'the agreement' is to be completely and absolutely controlled by [Texas] law [and the FAA]." (*Nedlloyd,*

*supra*, 3 Cal.4th at p. 469.) Because this case does not involve any federal claims or defenses, decisions of the United States Supreme Court and the Fifth Circuit are not binding as to the *substantive* law governing Peleg's causes of action. In any event, the substantive law, whatever it may be, is not relevant here.

■ In assessing the validity of a choice-of-law clause, "the proper approach . . . is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue . . . .' . . . If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra,* 3 Cal.4th at p. 466, citations & fns. omitted.)

Although *Nedlloyd* involved a dispute between "two sophisticated, commercial entities" (*Nedlloyd, supra,* 3 Cal.4th at p. 468; see *id.* at p. 470), its analysis has been applied in suits brought by (1) employees (see *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 885, 897 [72 Cal.Rptr.2d 73]; see also *Advanced Bionics Corp. v. Medtronic, Inc.* (2002) 29 Cal.4th 697, 708–709 [128 Cal.Rptr.2d 172, 59 P.3d 231] (conc. opn. of Brown, J.)); (2) consumers (see *Klussman v. Cross Country Bank* (2005) 134 Cal.App.4th 1283, 1286–1287, 1291 [36 Cal.Rptr.3d 728], overruled on another point in *AT&T Mobility LCC v. Concepcion* (2011) 563 U.S. ___ [179 L.Ed.2d 742, 131 S.Ct. 1740, 1746]; *Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 889–891 [36 Cal.Rptr.3d 456]); and (3) individual shareholders (see *McDermott Inc. v. Lewis* (Del. 1987) 531 A.2d 206, 215–217, cited with approval in *Nedlloyd,* at p. 471).

In this case, defendant, Neiman Marcus, while incorporated in Delaware, has its principal place of business, corporate headquarters, and operating center in Dallas, Texas. That is a sufficient relationship or basis to justify the Texas choice-of-law clause. (See *In re Commercial Money Center, Equipment Lease Litigation* (N.D. Ohio 2009) 627 F.Supp.2d 786, 801–802 [applying Nevada law as required by choice-of-law clause where one of contracting parties had headquarters in Nevada]; *Resource Technology Corp. v. Fisher Scientific*

(Wyo. 1996) 924 P.2d 972, 975 [applying choice-of-law clause selecting Pennsylvania law where a contracting party's "headquarters were located in Pennsylvania, and that state, therefore, had a reasonable relationship to the matters at issue in this case"]; *1-800-Got Junk? LLC v. Superior Court* (2010) 189 Cal.App.4th 500, 512–515 [116 Cal.Rptr.3d 923] [choice-of-law clause adopting law of Washington State had reasonable relationship to Canadian franchisor operating in several states because franchisor had legitimate interest in having law of single state apply to United States operations, and Washington was closest state to franchisor's headquarters in Vancouver, British Columbia].)

Likewise, Neiman Marcus conducts business throughout the United States and engages in interstate commerce, which is a reasonable basis for the parties to provide that the Agreement shall be governed by the FAA. (See *Pedcor Management v. Nations Personnel of Texas* (5th Cir. 2003) 343 F.3d 355, 361–362; *J.B. Hunt Transport, Inc. v. Hartman* (Tex.Ct.App. 2010) 307 S.W.3d 804, 808; *Harrison v. Eberhardt* (2007) 287 Ga.App. 561, 563 [651 S.E.2d 826]; *In re Alamo Lumber Co.* (Tex.Ct.App. 2000) 23 S.W.3d 577, 578–579; see also *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 476–477 [103 L.Ed.2d 488, 109 S.Ct. 1248].)

As explained in the Restatement Second of Conflict of Laws: "The forum will not apply the chosen law to determine issues the parties could not have determined by explicit agreement directed to the particular issue if the parties had no reasonable basis for choosing this law. The forum will not, for example, apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge. Situations of this sort do not arise in practice. Contracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so.

"When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is that where performance by one of the parties is to take place or *where one of the parties* is domiciled or *has his principal place of business*." (Rest.2d Conf. of Laws, *supra*, § 187, com. f, pp. 566–567, italics added; see *Hertz Corp. v. Friend* (2010) 559 U.S. ___ [175 L.Ed.2d 1029, 130 S.Ct. 1181, 1192] [corporation's headquarters, from which it controls operations, is principal place of business].)

Simply put, Neiman Marcus has a substantial relationship to Texas and engages in interstate commerce. It follows that the parties had an adequate basis for designating Texas law and the FAA to govern the Agreement.

We next examine Texas law and the FAA regarding illusory arbitration agreements. Ultimately, we must decide if the law chosen by the parties is contrary to a fundamental policy of California law.

### 1. *Texas Law*

In *In re Halliburton Co.* (Tex. 2002) 80 S.W.3d 566 (*Halliburton*), an employer sent notice to its at-will employees that it was adopting a dispute resolution program, mandating the arbitration of all disputes between the company and its employees. The notice stated that, by continuing to work after January 1, 1998, employees would be accepting the new program. James Myers, an at-will employee who had received the notice, continued to work past the specified date and was later demoted. He filed suit in Texas state court, alleging his demotion was based on his age and race in violation of the state's antidiscrimination law. The employer, Halliburton, moved to compel arbitration.

Myers opposed arbitration on the ground that the arbitration program was illusory. The trial court denied the motion, and the court of appeals declined to hear the matter. On petition for a writ of mandamus, the Texas Supreme Court rejected Myers's argument, saying: "[T]he Program is not *dependent* on continuing employment. Instead, it was *accepted* by the employee's continuing employment. When Myers reported for work after January 1, 1998, he accepted Halliburton's offer; both Myers and Halliburton became bound to arbitrate any disputes between them. Even if Myers' employment had ended shortly thereafter, the promise to arbitrate would have been binding and enforceable on both parties. . . . Thus, following Myers' acceptance, the Program was not dependent on continuing employment and was not illusory. . . .

"Myers also asserts that Halliburton's promises were illusory because the company retained the right to modify or discontinue the Program. But the Program also provided that '*no amendment shall apply to a Dispute of which the Sponsor [Halliburton] had actual notice on the date of amendment.*' As to termination, the plan stated that '*termination shall not be effective* until 10 days after reasonable notice of termination is given to Employees or *as to Disputes which arose prior to the date of termination.*' Therefore, Halliburton cannot avoid its promise to arbitrate by amending the provision or terminating it altogether. Accordingly, the provision is not illusory." (*Halliburton, supra*, 80 S.W.3d at pp. 569–570, some italics added, citation omitted.)

■ *Halliburton* is significant for four reasons. First, it established that an employer can impose a mandatory arbitration program on at-will employees by informing them they will be deemed to have accepted the program if they

work beyond a particular date. Second, an arbitration program is enforceable where the employer and the employees, respectively, mutually agree to arbitrate disputes against each other. Third, notwithstanding their at-will status, the employees may challenge the arbitration program on the ground it is not an enforceable contract. Last, a modification provision does not render an arbitration contract illusory if (1) an amendment exempts a claim of which the employer has actual notice (knowledge) on the effective date of the change, and (2) the termination of the arbitration contract exempts a claim that arose (accrued) before the date of termination.

As the Texas Supreme Court later explained in *J.M. Davidson, Inc. v. Webster* (Tex. 2003) 128 S.W.3d 223 (*Davidson*): "We recently considered whether an arbitration agreement between an employer and at-will employee was supported by sufficient consideration. *See In re Halliburton Co.[, supra,]* 80 S.W.3d at 566. . . . In *Halliburton*, the employer notified employees of a new alternative dispute resolution program that required both the employer and the employees to submit all employment-related disputes to binding arbitration. . . . The terms included the employer's right to modify or discontinue the program, but also required the employer to give its employees notice of changes and stated that any amendments would apply only prospectively. . . .

"We upheld the arbitration agreement between Halliburton and its employee. . . . We concluded that the employee's at-will employment status did not render the agreement illusory because Halliburton did not rely on continued employment as consideration for the agreement. Instead, mutual promises to submit all employment disputes to arbitration constituted sufficient consideration, because both parties were bound to the promises to arbitrate. . . .

"Halliburton's right to modify or terminate the policy did not allow the employer to avoid its promise to arbitrate because it was limited by express contract provisions. . . . First, the policy stated that any changes only applied *prospectively to unknown claims*. . . . And second, if Halliburton terminated the policy, such *termination* required notice and *applied to both Halliburton's and the employees' rights*. . . . Therefore, Halliburton could not avoid its promise to arbitrate by amending or terminating the dispute resolution program. . . . Because the express terms of the policy provided that both the employee and Halliburton were bound to their promises to arbitrate, we held the agreement was not illusory." (*Davidson, supra*, 128 S.W.3d at p. 228, citations omitted, some italics added.) The court also observed, "We note that most courts that have considered [the] issue have held that, if a party retains the unilateral, *unrestricted* right to terminate the arbitration agreement, it is illusory." (*Id.* at p. 230, fn. 2, italics added, citing cases.)

In *In re C & H News Co.* (Tex.Ct.App. 2003) 133 S.W.3d 642 (*C & H News*), an employer and its at-will employees had agreed to arbitration, as set forth in a one-page " 'Mutual Agreement to Arbitrate.' " (*Id.* at p. 646.) The arbitration agreement mandated arbitration in accordance with another document, the employee handbook, which included a section entitled " 'Mutual Arbitration Policy/Procedures.' " (*Ibid.*) The handbook recited that it " 'may, and likely will, be changed, modified, deleted or amended from time to time as the [employer] deems appropriate, with or without prior notification to employees.' " (*Ibid.*)

The Texas Court of Appeals concluded that the arbitration agreement was illusory, stating: "We are unable to disregard the material terms included in the handbook, which have been incorporated, by reference, into the arbitration agreement. Reading the agreement and handbook together, we hold that the purported arbitration agreement allows [the employer] to unilaterally amend the terms of the handbook, and in so doing, allows [the employer] to unilaterally amend the types of claims subject to arbitration. . . . [The employer] *retains the ability to pick and choose the claims* it[] wants to arbitrate.

■ "A contract must be based upon a valid consideration or mutuality of obligation. . . . Consideration may consist of either benefits or detriments to the contracting parties. . . . It may consist of some right, interest, profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party. . . . When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation and, thus, there is no contract. . . . A promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance. . . .

"Because [the employer] has reserved the right to unilaterally *amend the types of claims* covered by [the arbitration] agreement, we conclude that the . . . agreement is supported only by an illusory promise, and is unenforceable." (*C & H News, supra*, 133 S.W.3d at p. 647, citations omitted, italics added.)

Two years later, in a dispute between several pharmacies and their "benefits management" company, the Texas Supreme Court examined an arbitration clause contained in the parties' "Provider Agreement," which covered several subjects, including arbitration and the parties' reimbursement arrangements. (*In re AdvancePCS Health L.P.* (Tex. 2005) 172 S.W.3d 603, 605–607 (*AdvancePCS*).) The court rejected the pharmacies' contention that the arbitration clause was illusory, explaining: "[T]he pharmacies assert [that] provisions in the Provider Agreement allow [the management company] to cancel

the arbitration agreement at will, . . . rendering its promise illusory and the agreement without consideration. . . . *In the context of stand-alone arbitration agreements*, binding promises are required on both sides as they are the only consideration rendered to create a contract. . . . But *when an arbitration clause is part of an underlying contract*, the rest of the parties' agreement provides the consideration. . . . Having used [the management company's] services and network to obtain reimbursements for 10 years, the pharmacies cannot claim their agreement to arbitrate was without consideration." (*Id.* at p. 607, citations omitted, italics added.)

In *AdvancePCS*, the court also said that "the arbitration clause here is not illusory even if considered alone." (*AdvancePCS, supra*, 172 S.W.3d at p. 607.) The Provider Agreement included a provision stating, " 'Notwithstanding the termination of this Agreement, . . . *any obligations that arise prior to the termination* of the Agreement shall survive such termination.' " (*Ibid.*, italics added.) According to the court, "Had the pharmacies invoked arbitration rather than filing suit, [the management company] could not have avoided arbitration by terminating the Provider Agreement. Thus, the [arbitration] clause was not illusory." (*Id.* at pp. 607–608, fn. omitted.)

In *Morrison v. Amway Corp.* (5th Cir. 2008) 517 F.3d 248 (*Morrison*), the Fifth Circuit addressed the enforceability of an arbitration program established by the "Rules of Conduct" of Amway Corporation, a nationwide seller of household products. The rules, which outlined the arbitration program, among other things, governed Amway's relationship with its distributors. Amway reserved the right to " 'amend[] and publish[] [the rules] from time to time in official [company] literature.' " (*Id.* at p. 254.)

Beginning in the mid-1990's, the distributors complained about how profits were determined as to the sales of certain company products. In June 1997, those complaints "came to a head." (*Morrison, supra*, 517 F.3d at p. 251.) In September 1997, Amway notified the distributors it was adopting an arbitration program as part of its "Rules of Conduct." In January 1998, the distributors filed suit against Amway in Texas state court, alleging several state and federal claims. The following month, Amway removed the action to federal district court (see 28 U.S.C. § 1441(b)) and then filed a motion to compel arbitration of the distributors' claims. The district court granted the motion in October 1998. (*Morrison*, at p. 251.)

During the arbitration, Amway filed counterclaims against the distributors. After conducting a hearing, the arbitrator denied all of the distributors' claims and all of Amway's counterclaims. The arbitrator ruled that each side was entitled to attorney fees and issued an arbitration award with a net gain to Amway of $6 million ($7 million in attorney fees and costs to Amway, and

$1 million in fees and costs to the distributors). Amway moved to confirm the award; the distributors moved to vacate it. The district court confirmed the award and entered judgment. The distributors appealed. (*Morrison, supra,* 517 F.3d at pp. 252–253 & fn. 6.)

In the Fifth Circuit, the distributors argued that an enforceable arbitration agreement had never existed because Amway retained the right to amend the Rules of Conduct—which included the arbitration program—as published from time to time in company literature. More specifically, they asserted that Amway could not apply its 1998 arbitration program to claims that arose no later than 1997. (See *Morrison, supra,* 517 F.3d at pp. 253–254.) The circuit court discussed *Halliburton, Davidson, C & H News,* and *AdvancePCS* in ascertaining Texas law on illusory contracts. (See *Morrison,* at pp. 254–256.) It acknowledged the distinction made in *AdvancePCS, supra,* 172 S.W.3d at page 607, between stand-alone arbitration agreements and arbitration provisions that are part of an underlying contract, but declined to apply it, explaining: "[I]n *AdvancePCS* the court relied on the fact that the Provider Agreement not only stated that any amendments thereto made by [the management company] would not be effective prior to thirty days after notice thereof *but also that with respect to termination 'any obligations that arise prior to the termination of the Agreement shall survive such termination.'* . . . No such provision is present here. Moreover, nothing in *AdvancePCS* suggests any intention to repudiate or narrow the then so recent *Davidson* opinion." (*Morrison,* at p. 256, citation omitted, italics added.)

The Fifth Circuit ultimately held that the arbitration program was illusory and reversed the order confirming the award. The court reasoned: "There is no express exemption of the arbitration provisions from Amway's ability to unilaterally modify all rules, and the only express limitation on that unilateral right is published notice. While it is inferable that an amendment . . . unilaterally made by Amway to the arbitration provision would not become effective until published, there is nothing to suggest that once published the amendment would be inapplicable to *disputes arising, or arising out of events occurring, before such publication.*" (*Morrison, supra,* 517 F.3d at p. 254, some italics added.) "There is nothing in any of the relevant documents which precludes [an] amendment . . . eliminating the entire arbitration program or its applicability to . . . *claims or disputes . . . which had arisen and of which Amway had notice* prior to the [amendment's] publication. There are no *Halliburton* type savings clauses which preclude application of such amendments to *disputes which arose (or of which Amway had notice) before the amendment.*" (*Morrison,* at p. 257, italics added.)

■ More recently, in a case involving a stand-alone arbitration agreement, the Texas Supreme Court reiterated: "The enforceability of an arbitration agreement is a question of law. . . . Mutual agreement to arbitrate claims

provides sufficient consideration to support an arbitration agreement. . . . At-will employment does not preclude employers and employees from forming subsequent contracts, 'so long as neither party relies on continued employment as consideration for the contract.' . . . 'In the context of stand-alone arbitration agreements, binding promises are required on both sides as they are the only consideration rendered to create a contract.' . . . A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. . . . When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and therefore, no contract. . . .

"An arbitration clause is not illusory unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether." (*In re 24R, Inc.* (Tex. 2010) 324 S.W.3d 564, 566–567 (*24R, Inc.*), citations omitted.) The court distinguished *C & H News, supra,* 133 S.W.3d 642, saying that case did not involve a stand-alone arbitration agreement but, instead, an arbitration agreement contained in an employee handbook (see *24R, Inc.,* at p. 568).

In *Odyssey Healthcare, supra,* 310 S.W.3d 419, the employer provided employees with an "Occupational Injury Benefit Plan" in lieu of workers' compensation insurance. The plan stated in part: " '[T]he Company reserves the right to amend, modify, or terminate the Plan at any time . . . .' " (*Id.* at p. 421.) An employee challenged the plan as illusory. The Texas Supreme Court disagreed, noting: "In *Halliburton,* [*supra,* 80 S.W.3d 566,] we considered a very similar arbitration clause, which provided that 'no amendment shall apply to a Dispute of which the Sponsor [Halliburton] had actual notice on the date of amendment,' and that 'termination shall not be effective . . . as to Disputes which arose prior to the date of termination.' . . . Here, too, the agreement provided that 'no such amendment or termination [by the employer] will alter the arbitration provisions . . . in connection with . . . *an Injury occurring prior to the date of such amendment or termination,*' and that 'any such amendment or termination of the arbitration provisions incorporated into this booklet shall not be effective until at least 14 days after written notice has been provided to you.' " (*Odyssey Healthcare,* at p. 424, citation omitted, italics added.)

### a. *Notice Provision*

By agreeing to provide advance notice of a contract change—here, 30 days—Neiman Marcus did not save the Agreement from being illusory. As a practical matter, few aggrieved employees could file a claim with the AAA on one month's notice because it is an unrealistically short deadline. Nor would they be inclined to do so in light of the significantly longer statutes of limitations. (See *Davis v. O'Melveny & Myers* (9th Cir. 2007) 485 F.3d 1066,

1076–1077, overruled on another point in *Kilgore v. KeyBank, National Assn.* (9th Cir. 2012) 673 F.3d 947, 960; *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 117 [12 Cal.Rptr.3d 663].) And to the extent the 30 days operates as a statute of limitations, it is invalid as applied to statutory rights like those conferred by the FEHA. (See *Davis*, at pp. 1076–1077; *Martinez*, at p. 117.)

 A notice provision merely indicates *when* a contract change will take effect. Every change in an arbitration contract is implemented through notice of some type and goes into effect at sometime, be it immediately or in the future. No doubt, the 30-day notice provision in the Agreement constitutes a procedural restriction on Neiman Marcus's unilateral right to amend, modify, or terminate the arbitration process. Yet that restriction merely delays, for an insignificant period, the company's "right to decide . . . the nature or extent of [its] performance." (1 Williston on Contracts, *supra*, § 4:27, p. 804.) Notwithstanding the 30 days, Neiman Marcus "retains the option to discontinue performance" (*24R, Inc., supra*, 324 S.W.3d at p. 567) and "can avoid its promise to arbitrate by amending the [arbitration] provision or terminating it altogether" (*ibid.*).

Case law recognizes the distinction between a notice provision, which announces a contract change, and a savings clause, which precludes a contract change from applying to claims that have accrued or are known to the employer. In *Halliburton, supra*, 80 S.W.3d 566, the arbitration contract stated that a contract modification required 10 days' notice (see *id.* at pp. 569–570). But the notice provision alone did not make the contract enforceable. Rather, "[the] right to modify or terminate the [arbitration] policy did not allow [Halliburton] to avoid its promise to arbitrate because it was limited by express contract provisions. . . . First, the policy stated that any changes only applied prospectively to unknown claims. . . . And second, if Halliburton terminated the policy, such termination required notice and applied to both Halliburton's and the employees' rights." (*Davidson, supra*, 128 S.W.3d at p. 228, citations omitted.)

In *Morrison, supra*, 517 F.3d 248, the Fifth Circuit quoted and italicized the critical language from *Halliburton*, as follows: " ' "[N]o amendment shall apply *to a Dispute of which the Sponsor* [Halliburton] *had actual notice on the date of amendment.*" . . . " [*T*]*ermination shall not be effective . . . as to Disputes which arose prior to the date of termination.*" . . .' " (*Morrison*, at pp. 254–255, quoting *Halliburton, supra*, 80 S.W.3d at pp. 569–570.) *Morrison* also distinguished *Halliburton* on the ground "[t]here are no *Halliburton* type savings clauses [in the Amway arbitration program] which *preclude application of . . . amendments to disputes which arose (or of which Amway had notice) before the amendment.*" (*Morrison*, at p. 257, italics

added.) The 10-day notice period in the Halliburton arbitration agreement was not sufficient to make the contract enforceable. A savings clause was necessary to exempt claims, accrued or known, from contract changes.

In *24R, Inc., supra*, 324 S.W.3d 564, the Texas Supreme Court summarized its holding in *Halliburton*, saying: "[T]his Court held that because the [arbitration] policy contained a 'savings clause'—including a ten-day notice provision *and* a provision that any amendments would only apply prospectively—[which] prevented the employer from avoiding its promise [to arbitrate], the arbitration agreement was not illusory" (*24R, Inc.*, at p. 567, italics added).

And in *Odyssey Healthcare, supra*, 310 S.W.3d 419, the Texas Supreme Court held that an arbitration agreement was not illusory because (1) the modification clause required 14 days' notice of an amendment, modification, or termination, *and* (2) the arbitration agreement stated that " 'no . . . amendment or termination . . . will alter the arbitration provisions . . . in connection with . . . an Injury occurring prior to the date of such amendment or termination' " (*id.* at p. 424).

In *In re Golden Peanut Co., LLC* (Tex.Ct.App. 2008) 269 S.W.3d 302, writ conditionally granted on another point (Tex. 2009) 298 S.W.3d 629, the Texas Court of Appeals upheld an arbitration agreement because it contained a savings clause in addition to a notice provision. There, the agreement stated: " 'Company shall have the right to prospectively terminate this Agreement. Termination is not effective for Covered Claims which *accrued or occurred prior to the date of the termination*. Termination is also not effective until ten (10) days after reasonable notice is given to Claimant.' " (*Golden Peanut*, 269 S.W.3d at p. 308, italics added.) In concluding the agreement was enforceable, the court of appeals stated: "[The employer's] right to terminate the arbitration agreement operated prospectively only. It could *not* terminate the agreement for *any accrued claim* and could not terminate an employee's rights until providing at least ten days notice." (*Id.* at p. 309, italics added; see *In re H.E. Butt Grocery Co.* (Tex.Ct.App. 2000) 17 S.W.3d 360, 370 (*Butt Grocery Co.*) [employer's injury compensation plan not illusory because it stated " 'no amendment or termination of the Plan will affect *any claim* for expenses incurred *prior to the date the amendment or termination is adopted* . . .' " (italics added)], overruled on another point in *Halliburton, supra*, 80 S.W.3d at p. 571, fn. 3.)

Finally, in *Carey v. 24 Hour Fitness, USA, Inc.* (5th Cir. 2012) 669 F.3d 202 (*Carey*), the Fifth Circuit held that an *unrestricted* unilateral modification provision—granting the employer the right to revise, delete, or add to an arbitration agreement—rendered the agreement illusory. The court emphasized the need for a savings clause, explaining: "Although [the employer] is

correct that it is necessary for an employer seeking to change the terms of an employment contract to prove notice and acceptance of those changes, it does not follow that these two steps are sufficient to make a contract non-illusory. *Halliburton* makes this clear. In that case, the court discussed the proposition that an employer must give notice and obtain its employees' acceptance of any changes to the terms of employment. 80 S.W.3d at 568. It also held that Halliburton had satisfied these requirements and that the plaintiff had accepted its imposition of a dispute resolution program as a matter of law. *Id.* at 569. If notice and acceptance were all that were required to make an arbitration agreement non-illusory, the court could have answered the question of illusoriness at once upon finding that Halliburton had satisfied those requirements. Instead, later in the opinion, the court embarked upon a completely separate discussion of whether the arbitration agreement was illusory. *Id.* at 569–70. Nowhere in that discussion did the court suggest that its earlier holding—that notice and acceptance of the change had occurred— was sufficient to answer that question, or even that it factored into the inquiry at all. *Id.* Instead, the court's analysis of whether the agreement was illusory dealt exclusively with the *savings clause preventing any changes from having retroactive effect.*" (*Carey*, 669 F.3d at p. 207, italics added.)

The Fifth Circuit rejected "the proposition that notice is all that is required to keep an arbitration agreement from being illusory." (*Carey, supra*, 669 F.3d at p. 208, fn. 2; see *id.* at p. 208 ["notice [is] not sufficient to render an arbitration provision non-illusory . . .".) In *Carey*, a contract change went into effect upon notice; there was no notice period. As the circuit court stated, "the critical issue" is whether the arbitration agreement " 'avoid[s] application of . . . amendments to *disputes arising before notice.*' " (*Id.* at p. 209, fn. 4, italics added.) The court answered that question in the negative and held that the agreement was illusory. In doing so, it relied on well-settled principles of Texas law: " 'While it is inferable that an amendment . . . to the arbitration provision would not become effective until published, there is nothing to suggest that once published the amendment would be *inapplicable to disputes arising, or arising out of events occurring, before [notice].*' " (*Id.* at p. 208, some italics added, quoting *Morrison, supra*, 517 F.3d at p. 254; see *Carey*, at p. 206 [modification provision in employer's workers' compensation plan did not render plan illusory because provision stated that no amendment or termination would apply to " 'an Injury occurring prior to the date of such amendment or termination,' " quoting *Odyssey Healthcare, supra*, 310 S.W.3d at p. 424].)

In short, the 30-day notice in the agreement "is trivial." (*Ingle v. Circuit City Stores, Inc.* (9th Cir. 2003) 328 F.3d 1165, 1179, overruled on another point in *AT&T Mobility LCC v. Concepcion, supra*, 563 U.S. ___ [131 S.Ct. 1740].) The notice period, by itself, does not make the Agreement enforceable.

### b. *Filing Requirement*

■ Texas law mandates that an employer's unilateral right to amend, modify, or revoke a stand-alone arbitration agreement be *expressly* restricted so that a contract change does not apply to *any* claim that has accrued or of which the employer has knowledge. In this case, the Agreement provides that, after 30 days' written notice, a contract change applies to *all* claims not yet *filed* with the AAA. If a claim has accrued or is known to the employer but is not filed before the expiration of the 30-day period, it is subject to the amendment, modification, or revocation. As a result, the modification provision improperly creates two categories of claims: those filed within 30 days of notice—the protected category—and those that have accrued or are known to the employer but are not filed within 30 days—the unprotected category. Under Texas law, *all* claims that have accrued or of which the employer has knowledge must be protected from contract changes.

We do not suggest the Agreement is unenforceable solely because it exempts *filed* claims from contract changes. Rather, the Agreement fails because it exempts *only* filed claims—it does not go far enough. The Agreement should also exempt claims that have accrued or are known to the employer that are *not* filed within 30 days. Otherwise, Neiman Marcus would have the unfettered unilateral right to modify the arbitration process or terminate the Agreement as to those claims. It would "retain[] the ability to pick and choose the claims it[] wants to arbitrate" (*C & H News, supra*, 133 S.W.3d at p. 647), making the company's performance optional and thus illusory (see *Davidson, supra*, 128 S.W.3d at p. 230, fn. 2; Rest.2d Contracts, *supra*, § 2, com. e, p. 10; *id.*, § 77, com. a, p. 195).

■ This point is illustrated by *Carey, supra*, 669 F.3d 202. There, the arbitration agreement did not contain a savings clause, and a contract change took effect immediately upon notice. Under the agreement, a change would apply to " 'disputes arising, or arising out of events occurring, *before* [notice].' " (*Id.* at p. 208, quoting *Morrison, supra*, 517 F.3d at p. 254; see *Carey*, at p. 209, fn. 4.) The circuit court therefore concluded the agreement was illusory. The court also said that claims must be exempt from contract changes *once arbitration has commenced.* (See *Carey*, at pp. 205, 206, 209 [arbitration agreement illusory if contract changes apply to claims where arbitration "invoke[d]," "already underway," "pending," or "already in progress"].) *Carey*'s analysis is sound: Claims already in arbitration are a *subset* of claims that have accrued or are known to the employer and must be exempt from contract changes. Yet the exemption in the Neiman Marcus arbitration agreement is *limited* to claims in arbitration—"filed" claims—and fails to exempt *all* claims, accrued or known, *not filed within 30 days after notice*. That omission proves fatal to the Agreement: "[W]here one party to

an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset." (*Id.* at p. 205.)

 Texas courts have consistently held that changes made in an arbitration agreement pursuant to a unilateral modification provision must be applied "prospectively." (See *24R, Inc., supra,* 324 S.W.3d at p. 567; *In re Polymerica, LLC* (Tex. 2009) 296 S.W.3d 74, 76; *Davidson, supra,* 128 S.W.3d at pp. 228, 230; *Weekley Homes, L.P. v. Rao* (Tex.Ct.App. 2011) 336 S.W.3d 413, 421; *In re Golden Peanut Co., LLC, supra,* 269 S.W.3d at p. 309; *In re Champion Technologies, Inc.* (Tex.Ct.App. 2006) 222 S.W.3d 127, 132 (*Champion Technologies*); *In re Brookshire Brothers, Ltd.* (Tex.Ct.App. 2006) 198 S.W.3d 381, 386.)

And, under Texas law, the "prospective" application of a contract change excludes claims that have accrued or are known to the employer before the change takes effect. (See *Halliburton, supra,* 80 S.W.3d at pp. 569–570; *Davidson, supra,* 128 S.W.3d at p. 228; *Odyssey Healthcare, supra,* 310 S.W.3d at p. 424; *In re Golden Peanut Co., LLC, supra,* 269 S.W.3d at p. 309; *In re Brookshire Brothers, Ltd., supra,* 198 S.W.3d at p. 386; *Butt Grocery Co., supra,* 17 S.W.3d at p. 370; *Carey, supra,* 669 F.3d at p. 209, fn. 4 [applying Texas law]; *Morrison, supra,* 517 F.3d at p. 257 [same].) "To interpret the arbitration clause to apply retroactively would cause [the employee] to forego her vested right to litigate an *accrued* claim." (*In re Brookshire Brothers, Ltd., supra,* at p. 386, italics added.)

Two hypotheticals demonstrate the mischief permitted by an illusory arbitration agreement. For instance, Neiman Marcus could learn about a California employee's sexual harassment claim when the employee raises the issue with the personnel department in an effort to resolve the dispute informally. The company then conducts an investigation, determines the claim might have merit, and decides to change the Agreement to provide greater protection against liability. It gives written notice to employees that the Agreement is being amended by stating (1) a sexual harassment claim brought by a California employee shall be heard by a panel of *three* arbitrators; (2) the arbitration award in such a case shall be subject to judicial review for errors of fact and law; and (3) the current choice-of-law clause shall not apply to that type of claim and instead California law shall govern the Agreement and arbitration. (See *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1361 [82 Cal.Rptr.3d 229, 190 P.3d 586].) Because the parties appear close to a settlement of the sexual harassment matter, the employee does not file a claim with the AAA within 30 days after notice. Ultimately, the dispute is not amicably resolved, and, upon initiating arbitration, the employee is bound by the new provisions.

To take another example, Neiman Marcus decides to reorganize its sales structure in an area on the East Coast. In one state, some stores close, resulting in the layoff of several at-will employees. Shortly after the layoffs are completed, the federal circuit court for that state renders a decision narrowly construing the exceptions to the at-will doctrine, interpreting state law more favorably to employers than the state courts. Neiman Marcus promptly amends the Agreement to shorten the notice period from 30 days to 10, effective immediately, and terminates the Agreement so it does not apply in the affected state. No employees file a claim with the AAA before the 10-day period expires. More than 10 days after notice of the changes, some employees file individual suits in state court, alleging common law claims for termination in violation of public policy, termination in violation of an implied-in-fact contract, and breach of the covenant of good faith and fair dealing. Neiman Marcus removes the civil actions to the appropriate federal district courts. (See 28 U.S.C. § 1441(b).) It promptly seeks to dismiss the suits for failure to state a claim upon which relief can be granted, relying on the recent federal circuit decision. (See Fed. Rules Civ.Proc., rule 12(b)(6), 28 U.S.C.)

The vice of the modification provision in this case is that it allows the employer to manipulate the arbitration process, tailoring it to fit specific cases, either by making the process more difficult or more expensive for the employee, or by revoking the Agreement in the belief that a judicial forum is preferable. Accordingly, if a claim has accrued or if the employer knows about a claim, all parties to the Agreement should be bound by the version in effect at that time; no changes should apply after the point of accrual or knowledge.

An employer often acquires knowledge of an employee's claim through the procedures established within the company to respond to unlawful employment practices. (See *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1045–1048 [6 Cal.Rptr.3d 441, 79 P.3d 556] [if employer adopts appropriate antiharassment policies and has communicated essential information about the policies and the implementing procedures to its employees, employee's failure to use procedures may lower employer's damages where supervisor has sexually harassed subordinate employee].) If an employee's internal complaints about unlawful activity are not resolved, the employer should not be able to change the arbitration process just because the employee sought the employer's assistance before resorting to a more formal approach like arbitration. Further, if a claim accrues at the end of the 30-day notice period, the contract change is not being realistically applied in a prospective manner: The employee has insufficient time to file a claim with the AAA and is subject to the change.

We note that three decisions by the Texas Court of Appeals are inconsistent with *Halliburton* and its progeny. (See *In re Kellogg Brown & Root* (Tex.Ct.App. 2002) 80 S.W.3d 611, 614, 616 (*Kellogg*); *Nabors Drilling USA, LP v. Carpenter* (Tex.Ct.App. 2006) 198 S.W.3d 240, 248–249 (*Nabors Drilling*); *Champion Technologies, supra,* 222 S.W.3d at pp. 131–132.) In all three cases, the court of appeals upheld an arbitration agreement containing a unilateral modification provision that applied contract changes to *all* claims, whether accrued or known, unless *arbitration was initiated* within a specified time after notice of the change: 10 days in *Kellogg* and *Nabors Drilling;* 30 days in *Champion Technologies.* Significantly, *Kellogg* was decided before *Halliburton. Nabors Drilling,* though decided after *Halliburton,* relied in large part on *Kellogg.* (See *Nabors Drilling,* at pp. 246, 248–249.) And while *Champion Technologies* recognized that the Texas Supreme Court "upheld the [arbitration] provisions in *Halliburton* because amendments to the arbitration agreement only applied *prospectively to unknown claims*" (*Champion Technologies,* at p. 131, some italics added), the court of appeals nonetheless upheld an agreement that applied amendments retroactively to known claims if arbitration was not initiated within 30 days of notice (see *id.* at pp. 131–133).

We decline to follow the *Kellogg* trilogy because it is contrary to the Texas Supreme Court opinions in *Halliburton, Davidson,* and *Odyssey Healthcare,* the Fifth Circuit opinions in *Morrison* and *Carey,* and other Texas Court of Appeals cases we have cited or discussed. *Kellogg, Nabors Drilling,* and *Champion Technologies* enforced an arbitration agreement even though it had no savings clause exempting from change *all* claims that had accrued or were known to the employer. And the time periods for initiating arbitration were so unrealistically short that virtually every claim was subject to any contract change. "There [were] no *Halliburton* type savings clauses which preclude[d] application of . . . amendments to disputes which arose (or of which [the employer] had notice) before the amendment." (*Morrison, supra,* 517 F.3d at p. 257.) In "the absence of . . . a '*Halliburton* type savings clause[]' . . . [an] arbitration provision . . . [is] illusory." (*Carey, supra,* 669 F.3d at p. 206.)

In another case, *In re HEB Grocery Co., L.P.* (Tex.Ct.App. 2009) 299 S.W.3d 393, an employee challenged his employer's "Work Injury Benefit Plan" as illusory. There, the modification provision stated: " '[The employer] reserves the right to amend or terminate the Plan at any time. *No amendment shall apply to any claim of which [the employer] has actual notice on the date of amendment. No amendment or termination shall be effective* until 10 days after reasonable notice of termination or amendment is provided by [the employer] or *as to claims that arose prior to the date of amendment or termination. No amendment or termination of the Plan will*

*affect any claim for expenses incurred prior to the date the amendment or termination is adopted,* except as permitted by law.' " (*Id.* at p. 399, italics added.)

The Texas Court of Appeals concluded the injury benefit plan was not illusory. Citing *Halliburton, supra,* 80 S.W.3d at page 570, the court noted, "The Texas Supreme Court has considered and . . . rejected the argument that language similar to that herein rendered an arbitration agreement illusory." (*In re HEB Grocery Co., L.P., supra,* 299 S.W.3d at p. 399.) The court also relied on *Butt Grocery Co., supra,* 17 S.W.3d at page 370, in which an employer's injury benefit plan contained a savings clause that stated: " ' "[N]o amendment or termination of the Plan will affect any claim for expenses incurred prior to the date the amendment or termination is adopted . . . ." ' " (*In re HEB Grocery Co., L.P.,* at pp. 399–400.) The court went on to cite *Kellogg* and *Nabors Drilling,* saying: "[A]ny amendment or termination of the arbitration agreement . . . is inapplicable to claims that have already been *initiated.*" (*In re HEB Grocery Co., L.P.,* at p. 400, italics added.)

 Thus, the court of appeals analyzed the provision under *Halliburton* and *Butt Grocery Co.,* properly concluding it was not illusory: The modification provision contained a savings clause exempting from change all claims that had accrued or were known to the employer. The court's discussion of claims already in arbitration was entirely proper: A savings clause that exempts from change all claims that have accrued or of which the employer has knowledge necessarily includes a claim that has been filed with the AAA or as to which arbitration has been initiated. Consequently, *In re HEB Grocery Co., L.P.* supports our interpretation of Texas law.

### 2. *The FAA*

The Agreement states that it is governed by the FAA as well as Texas law. We therefore examine decisions under the FAA.

 The prevailing view under the FAA regarding illusory arbitration agreements is the same as that of the Texas state courts: An employer's *unrestricted* right to amend, modify, or terminate an arbitration agreement at any time renders the agreement illusory. But, in deciding whether a contract is illusory, federal courts do not distinguish between a stand-alone arbitration agreement and an arbitration provision that is part of an employee handbook, manual, or set of rules. (See, e.g., *Morrison, supra,* 517 F.3d at pp. 254, 257; *Dumais v. American Golf Corp.* (10th Cir. 2002) 299 F.3d 1216, 1219; *Penn v. Ryan's Family Steak Houses, Inc.* (7th Cir. 2001) 269 F.3d 753, 759–761; *Floss v. Ryan's Family Steak Houses, Inc.* (6th Cir. 2000) 211 F.3d 306,

315–316; *Hooters of America, Inc. v. Phillips* (4th Cir. 1999) 173 F.3d 933, 939; *Harris v. Blockbuster, Inc.* (N.D.Tex. 2009) 622 F.Supp.2d 396, 398–399; *Zamora v. Swift Transportation Corp.* (W.D.Tex. 2008) 547 F.Supp.2d 699, 703–704, affd. mem. (5th Cir. 2009) 319 Fed.Appx. 333; *Stein v. Burt-Kuni One, LLC* (D.Colo. 2005) 396 F.Supp.2d 1211, 1215; *Phox v. Atriums Management Co., Inc.* (D.Kan. 2002) 230 F.Supp.2d 1279, 1282–1283; *Snow v. BE&K Construction Co.* (D.Me. 2001) 126 F.Supp.2d 5, 10, 13–15; *Gourley v. Yellow Transportation, LLC* (D.Colo. 2001) 178 F.Supp.2d 1196, 1202; see also *Morrow v. Hallmark Cards, Inc.* (Mo.Ct.App. 2008) 273 S.W.3d 15, 25–27; *Salazar v. Citadel Communications Corp.* (2004) 135 N.M. 447, 450–451 [90 P.3d 466].)

In addition, as federal courts have pointed out, an arbitration agreement may be illusory regardless of whether an employer has *exercised* its unilateral right to amend, modify, or terminate the agreement; it is the *ability* to do so that matters. (See, e.g., *Harris v. Blockbuster, Inc., supra*, 622 F.Supp.2d at pp. 399–400; *Phox v. Atriums Management Co., Inc., supra*, 230 F.Supp.2d at p. 1283.)

Under the FAA, federal courts have held that an arbitration agreement is not illusory if the employer's right to amend, modify, or terminate the agreement is restricted so that a contract change excludes *all* claims that have accrued or of which the employer has knowledge. (See, e.g., *Carey, supra*, 669 F.3d at p. 209, fn. 4 [where contract change made pursuant to unilateral modification provision takes effect upon notice, arbitration agreement is enforceable if change does not apply to disputes arising before notice]; *Morrison, supra*, 517 F.3d at pp. 254, 257 [arbitration agreement not illusory if it provides that amendment by employer is inapplicable to claims arising out of events occurring before amendment's effective date and to claims known to employer before effective date]; *Hardin v. First Cash Financial Services* (10th Cir. 2006) 465 F.3d 470, 478 [arbitration agreement not illusory because it provided that employer could not "amend the Agreement if it has actual notice of a potential dispute or claim, nor may it terminate the Agreement as to any claims which arose prior to the date of termination"]; *Seawright v. American General Financial Services* (6th Cir. 2007) 507 F.3d 967, 974–975 [employer reserved right to terminate arbitration program at any time but agreed to be bound by program "as to all known disputes arising before the date [of] termination"]; *Melton v. Philip Morris Inc.* (9th Cir. 2003) 71 Fed.Appx. 701, 703–704 [arbitration agreement not illusory because employer could not amend agreement as to "prior disputes" and had agreed to apply amendment or termination "only prospectively"]; see also *Sisneros v. Citadel Broadcasting Co.* (2006) 140 N.M. 266, 268, 274–275 [142 P.3d 34] [deciding, as a matter of state law, that arbitration agreement was not illusory because employer "[gave] up its right to change or terminate its agreement to arbitrate disputes upon accrual of an employee's claim"].)

The similarity between decisions under the FAA and Texas law is not surprising for two reasons. First, courts applying the FAA rely on *state* law contract principles in determining whether an arbitration agreement exists. (See *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. at p. 944; see, e.g., *Hardin v. First Cash Financial Services, supra,* 465 F.3d at pp. 478–479 [circuit court relying on Okla. contract law]; *Seawright v. American General Financial Services, supra,* 507 F.3d at pp. 974–975 [circuit court relying on Tenn. contract law].) Second, principles of contract law do not vary significantly from state to state. (See *Phox v. Atriums Management Co., Inc., supra,* 230 F.Supp.2d at p. 1282.)

Last, the FAA—unlike Texas law—does not require a savings clause that *expressly* exempts all claims, accrued or known, from contract changes. An *implied* exemption is also permitted. (See, e.g., *O'Neil v. Hilton Head Hospital* (4th Cir. 1997) 115 F.3d 272, 274; *Morrow v. Hallmark Cards, Inc., supra,* 273 S.W.3d at p. 31, fn. 1 (conc. opn. of Ahuja, J.).) "[I]t is well-settled that 'an implied obligation to use good faith is enough to avoid finding a contract null and void due to an illusory promise.'" (*Cordry v. Vanderbilt Mortgage & Finance, Inc.* (8th Cir. 2006) 445 F.3d 1106, 1110.) "If there is a restriction, express *or implied,* on the promisor's ability to terminate or to refuse to perform, the promise is not illusory." (2 Corbin on Contracts (rev. ed. 1995) § 5.28, p. 149, italics added.)

### 3. California Law

We discuss California law on illusory arbitration contracts to decide whether the law chosen by the parties is in conflict with a fundamental policy of California.

In *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199 [78 Cal.Rptr.2d 533] (*24 Hour Fitness*), a female employee of 24 Hour Fitness, Inc., doing business as 24 Hour Nautilus (Nautilus), filed suit against her employer and several male employees, alleging sexual harassment. Nautilus and the individual defendants filed motions for summary judgment and summary adjudication, seeking to establish that the employee had to arbitrate her claim as mandated by the "Arbitration of Disputes" section of its "Personnel Handbook." A separate document entitled "Employment Arbitration Procedures Manual" was incorporated by reference into the Personnel Handbook.

The employee opposed the motion on the ground that the Personnel Handbook was illusory because Nautilus could amend it at any time. The handbook contained a provision stating: " 'I acknowledge that Nautilus reserves the right to change any provision in this Handbook at any time for

any reason without advance notice. Though Nautilus can make changes, I understand that nothing in this Handbook can be modified or deleted, nor anything added, in any way by oral statement or practice. Only the President of Nautilus can change this Handbook and the change must be in writing. If Nautilus makes any material changes, it will give me a copy of them.' " (*24 Hour Fitness, supra,* 66 Cal.App.4th at pp. 1213–1214.) When hired, the employee had signed an acknowledgment form, reciting that she had received and read the handbook and had also agreed to arbitrate all claims as provided in the arbitration procedure manual. (*Id.* at p. 1205.) The trial court denied the motions. All parties sought writ relief.

In reversing the trial court as to all but one defendant, the Court of Appeal concluded, in two paragraphs, that the modification provision was not illusory, saying in part: " ' "[W]here the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair dealings." ' . . . Nautilus's discretionary power to modify the terms of the personnel handbook in [written] notice indisputably carries with it the duty to exercise that right fairly and in good faith. . . . So construed, the modification provision does not render the contract illusory." (*24 Hour Fitness, supra,* 66 Cal.App.4th at p. 1214, citations omitted; accord, *Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1246 [100 Cal.Rptr.2d 403].)

Neither *24 Hour Fitness* nor any other California decision has precisely defined the limitations that the covenant of good faith and fair dealing places on an employer's unilateral right to modify an arbitration agreement. In general, while the covenant may imply limitations making the use of that right fair and in good faith, it may not give rise to duties or obligations that conflict with the agreement's express terms. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710]; *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 630 [41 Cal.Rptr.2d 329].)

We find guidance in *Russ Berrie and Co., Inc. v. Gantt* (Tex.Ct.App. 1999) 998 S.W.2d 713. There, a Texas resident sought to litigate his employment claims in Texas state court against a New Jersey-based employer. The employee's contract provided that it was to be interpreted under the laws of the State of New Jersey. (*Id.* at pp. 716–717.) The contract also reserved to the employer " 'the right at any time to change, interpret, discontinue or modify this Agreement.' " (*Id.* at p. 716.)

The Texas Court of Appeals first examined and upheld the validity of the choice-of-law provision, adopting New Jersey law. It then determined that the

modification provision did not render the arbitration agreement illusory, saying: "The contract provision which allows [the employer] to unilaterally modify any of the contract terms is . . . problematic. Were we to interpret this contract under Texas law, we might well find that this clause renders the agreement illusory, as nothing would bind the employer to any of its terms. Under the bare modification language, we see nothing which would prevent [the employer] from disavowing any part of the agreement at its sole option. There is nothing in the contract language, then, which would bind [the employer] to arbitrate a dispute, or accept an arbitrator's adverse decision.

"New Jersey law, however, implies a duty of good faith and fair dealing in all contracts, including employment contracts, regardless of whether the relationship is characterized generally as at will. Where a modification, interpretation, or discontinuation of the contract must comply with the duty of good faith, we conclude that *the company could not refuse to comply with the arbitration clause once a dispute arising out of [the plaintiff's] employment or termination arose.* We conclude therefore, under the law chosen by the parties, that the contract is not illusory and the arbitration clause is enforceable." (*Russ Berrie and Co., Inc. v. Gantt, supra,* 998 S.W.2d at p. 718, fns. omitted, italics added.)

 Similarly, in applying the FAA under California contract law, the covenant of good faith and fair dealing may save an arbitration agreement from being illusory notwithstanding the absence of an express savings clause: A unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the covenant so that changes do not apply to such claims. Under this analysis, the arbitration agreement in *24 Hour Fitness* is not illusory. If, however, a modification provision expressly addresses whether contract changes apply to claims that have accrued or are known to the employer, the covenant cannot create implied terms that contradict the express language. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,* 2 Cal.4th at p. 374; *Camp v. Jeffer, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th at p. 630.) An arbitration agreement that expressly *exempts* all claims, accrued or known, from contract changes is valid and enforceable without resort to the covenant. If, on the other hand, an arbitration agreement expressly applies a contract change to such claims, the covenant cannot vary the plain language, and the agreement is illusory.

Further, *24 Hour Fitness* involved an arbitration agreement that was part of a personnel handbook; it was not a stand-alone agreement. Yet, that distinction played no role in the Court of Appeal's decision. Nor should it. Consistent with the prevailing view under the FAA, *24 Hour Fitness* did not distinguish between a stand-alone arbitration agreement, on the one hand, and

an arbitration provision that is part of an employee handbook, manual, or set of rules, on the other hand, in determining whether the agreement was illusory.

## C. *Application of Texas Law*

We must now determine whether Texas law or the FAA "is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue . . . .' . . . If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra*, 3 Cal.4th at p. 466, citation & fns. omitted.)

 Under Texas law, an arbitration agreement containing a modification provision must *expressly* state that a change in the agreement will not apply to a claim that has arisen or is known to the employer. Under California law, a court may *imply* such a restriction if an arbitration agreement is silent on the issue. Both states value an employer's commitment to *mutual* binding arbitration that does not countenance retroactive changes. Indeed, by requiring that employers include an *express* savings clause in an arbitration agreement, Texas law is more demanding than California law, which, depending on the circumstances, may *imply* such a restriction. Thus, it can hardly be said that Texas law is contrary to a fundamental policy of California. And the prevailing view under the FAA is substantially similar to Texas law with two notable exceptions: Like California law, the FAA (1) permits implied as well as express terms to limit an employer's unilateral right to change an arbitration agreement and (2) does not distinguish between a stand-alone arbitration agreement and an arbitration provision that is part of an employee handbook, manual, or set of rules in determining enforceability.

The question remains as to whether Texas law or the FAA should determine if the Agreement is illusory. Neiman Marcus argues that Texas law governs. Peleg urges application of the FAA. As noted, the FAA relies on *state*-law contract principles in determining whether an arbitration agreement exists. (See *First Options of Chicago, Inc. v. Kaplan, supra*, 514 U.S. at p. 944; see pt. IIB.2., *ante*.) There is no "federal general common law under the FAA." (*Douglas v. U.S. Dist. Court for Central Dist. California* (9th Cir. 2007) 495 F.3d 1062, 1067, fn. 2.) "Before a . . . court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply. It makes this determination using the

choice-of-law rules of the forum state, which in this case is California." (*Pokorny v. Quixtar, Inc.* (9th Cir. 2010) 601 F.3d 987, 994.) Under California choice-of-law rules, Texas law governs whether the Agreement is enforceable because the Agreement's choice-of-law clause adopts Texas law. (See *ibid.*; *S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 749; see also *Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at pp. 914–921; *Pro Tech Industries, Inc. v. URS Corp.* (8th Cir. 2004) 377 F.3d 868, 869, 872.)

 Neiman Marcus may amend, modify, or revoke the Agreement on 30 days' advance written notice, and an amendment, modification, or revocation applies to all claims not *filed* with the AAA within 30 days thereafter. Under Texas law, a modification provision must contain a savings clause expressly exempting all claims, accrued or known, from contract changes. But the Agreement does not have a savings clause "stat[ing] that any amendments would apply only prospectively." (*Davidson, supra,* 128 S.W.3d at p. 228.) Absent a savings clause of the type in *Halliburton, supra,* 80 S.W.3d at pages 569 to 570—reciting that a contract change does not apply to *any* claims that have accrued or of which the employer has knowledge—the modification provision permits Neiman Marcus to "avoid its promise to arbitrate by amending the provision or terminating it altogether" (*id.* at p. 570).

Texas law dictates that the Agreement is illusory and unenforceable. The orders compelling arbitration and confirming the arbitration award are reversed. On remand, the case shall be heard in a court of law.

### III

### DISPOSITION

The order granting the motion to compel arbitration and the order confirming the arbitration award are reversed. On remand, the case shall be placed on the civil active list and shall be heard in a court of law. Peleg is awarded costs on appeal.

Johnson, J., concurred.

**ROTHSCHILD, J.,** Dissenting.—I respectfully dissent. The parties' arbitration agreement provides that the agreement shall be construed, governed by, and enforced in accordance with Texas law. Under Texas law, the agreement is enforceable and not illusory. (*In re Champion Technologies, Inc.* (Tex.Ct.App. 2006) 222 S.W.3d 127, 132; *Nabors Drilling USA, LP v. Carpenter* (Tex.Ct.App. 2006) 198 S.W.3d 240, 248–249 (*Nabors Drilling*);

*In re Kellogg Brown & Root* (Tex.Ct.App. 2002) 80 S.W.3d 611, 616.) We should therefore affirm the judgment.

As the majority correctly observes, the threshold issue in this case is whether a court rather than an arbitrator should determine the enforceability of the arbitration agreement. The parties did not brief Texas law on that issue, and the majority applies California law instead, concluding that the issue should be determined by a court because the parties' agreement does not clearly and unmistakably provide that enforceability questions are to be decided by an arbitrator. On the merits of the enforceability issue, the majority concludes that the agreement is illusory and unenforceable under Texas law.

Assuming for the sake of argument that we should apply California law rather than Texas law in deciding the threshold issue of whether a court or an arbitrator should determine enforceability, and assuming for the sake of argument that under California law a court should determine it, the majority's conclusion on the enforceability issue is still incorrect as a matter of Texas law. Under Texas law, the agreement is not illusory.

In *In re Kellogg Brown & Root*, the Court of Appeals of Texas considered an arbitration agreement that could be unilaterally modified or terminated upon 10 days' notice but under which "the amendment or termination will not apply to any dispute for which a proceeding has been initiated . . . ." (*In re Kellogg Brown & Root, supra*, 80 S.W.3d at p. 614.) The court held that the agreement was "binding and enforceable." (*Id.* at p. 616.) That case is not distinguishable from the case before us, and no Texas case holds to the contrary.

*In re Kellogg Brown & Root* was decided the month before the Supreme Court of Texas decided *In re Halliburton Co.* (Tex. 2002) 80 S.W.3d 566 (*Halliburton*). *Halliburton* addressed an employment arbitration agreement that allowed the employer unilaterally to amend (apparently without notice) or terminate upon 10 days' notice; amendments would not apply to disputes of which the employer had actual notice on the date of the amendment, and disputes that arose before the date of termination would be governed by the pretermination arbitration agreement. (*Id.* at pp. 569–570.) The court held that the agreement was not illusory, because the employer could not "avoid its promise to arbitrate by amending the provision or terminating it altogether." (*Id.* at p. 570.) The court never stated or implied that the agreement's restrictions on modification and termination were the absolute minimum necessary for an agreement to be nonillusory, so the case casts no doubt on the continuing validity of *In re Kellogg Brown & Root*.

Two later opinions of the Court of Appeals of Texas applying *Halliburton* have reached the same conclusion as *In re Kellogg Brown & Root. In re Champion Technologies, Inc.*, dealt with an arbitration agreement that could be unilaterally amended or terminated by the employer upon 30 days' notice but under which the amendment or termination would not apply to proceedings that had already been initiated. (*In re Champion Technologies, Inc., supra*, 222 S.W.3d at p. 131.) Applying *Halliburton*, the court concluded that the agreement was enforceable and not illusory. (*Id.* at pp. 131–132.) *Nabors Drilling* dealt with an arbitration agreement that could be unilaterally amended or terminated by the employer upon 10 days' notice but under which the amendment or termination would not apply to proceedings that had already been initiated. (*Nabors Drilling, supra*, 198 S.W.3d at p. 248, fn. 7.) Applying *Halliburton*, the court concluded that the agreement was enforceable and not illusory. (*Id.* at pp. 248–249.)

We are not free to disregard *In re Kellogg Brown & Root, In re Champion Technologies, Inc.*, and *Nabors Drilling*. They are not merely persuasive authority concerning the contours of Texas law—they *are* Texas law. They have not received any negative treatment in any published opinions of Texas's appellate courts. Accordingly, a Texas legal treatise presents their holding as an uncontroversial principle of Texas law: "An employer's ability to amend or terminate an arbitration agreement does not make the agreement illusory and unenforceable, when the employer is required to give notice to its employees of any amendment or termination, but any amendment or termination is inapplicable to pending arbitration proceedings . . . ." (13 Dorsaneo, Texas Litigation Guide (Matthew Bender 2012) § 203.48[3], p. 203-90 (rel. 104-3/2012).)

*In re Kellogg Brown & Root, In re Champion Technologies, Inc.*, and *Nabors Drilling* are not "inconsistent with *Halliburton* and its progeny." (Maj. opn., *ante*, at p. 1460.) The majority bases its contrary conclusion on its assertion that "[u]nder Texas law, *all* claims that have accrued or of which the employer has knowledge must be protected from contract changes" in order for the arbitration contract to be nonillusory. (Maj. opn., *ante*, at p. 1457.) That assertion is incorrect, because there is no authority for it in Texas law. *In re Kellogg Brown & Root, In re Champion Technologies, Inc.*, and *Nabors Drilling* are in no way inconsistent with any of the Texas or federal cases on which the majority relies.

The central issue can be summarized as follows: Three published opinions of the Court of Appeals of Texas have addressed challenges to arbitration agreements that could be unilaterally amended or terminated by the employer upon 10 to 30 days' notice but under which the amendment or termination would not apply to proceedings that had already been initiated. All three cases held that the agreements were not illusory.

There are two possible ways in which a conflict could arise in Texas law on that point. On the one hand, a published case decided under Texas law and involving the same kind of arbitration agreement—that is, an agreement that could be unilaterally amended or terminated by the employer upon at least 10 days' notice but under which the amendment or termination would not apply to proceedings that had already been initiated—could hold or state in dicta that the agreement is illusory. But there is no such case. On the other hand, a published case decided under Texas law could hold or state in dicta that a *more generous* savings clause—such as one prohibiting application of an amendment or termination to all claims, filed or unfiled, arising out of events that took place before the amendment or termination—is the *minimum* necessary to prevent an arbitration agreement from being illusory. But again, there is no such case. I conclude that there is no conflict in Texas law and that we are consequently bound by *In re Kellogg Brown & Root*, *In re Champion Technologies, Inc.*, and *Nabors Drilling*.

Because the arbitration agreement in this case is enforceable and not illusory under Texas law, the judgment should be affirmed. I therefore respectfully dissent.