Filed 10/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

DONALD DAVIS et al.,

     Plaintiffs and Respondents,

v.

TWC DEALER GROUP, INC. et al.,

     Defendants and Appellants.

A155030

(Contra Costa County
Super. Ct. No. C-18 00228)

     This is an appeal from an order denying a petition to compel arbitration. We easily affirm the order. And we publish, to also affirm—and remind the profession of—the importance of candor toward the court.

## BACKGROUND

**The Facts**

     Appellant TWC Dealer Group, Inc. (TWC) operated a Toyota dealership in Walnut Creek. In the spring of 2013, respondents Donald Davis, Bonnie Davis, and Raymond Davis (when referred to collectively, the Davises) sought employment at TWC, to run its special finance department. The Davises are African-American, and Donald Davis is over the age of 40. And in connection with that employment, all of the Davises were required to sign three separate agreements, each providing that the Davises agreed to arbitration.

     At no place in its 72-pages of briefing here does TWC quote the entirety of any, let alone all, of the agreements, which we note are all different. Specifically:

     The first agreement, signed by the Davises on April 3, 2013, is entitled "Applicant Statement and Agreement" (hereafter, for consistency with the briefing, Agreement No. 1.) Agreement No. 1 is one page long, and consists of six paragraphs, all in identical

1

and small—and quite difficult to read—font.  None of the six paragraphs is labeled or titled, in boldface or otherwise.  The fourth of the six paragraphs is the one that refers to arbitration, though hardly in language that is easy to comprehend.  The paragraph is 30 lines long, and ends with these three sentences:  "If CCP § 1284.2 conflicts with other substantive statutory provisions or controlling case law, the allocation of costs and arbitrator fees shall be governed by said statutory provisions or controlling case law instead of CCP §1284.2.  Both the Company and I agree that any arbitration proceeding must move forward under the Federal Arbitration Act (9 U.S.C. §§ 3–4) even though the claims may also involve or relate to parties who are not parties in the arbitration agreement and/or claims that are not subject to arbitration; thus, the court may not refuse to enforce this arbitration agreement and may not stay the arbitration proceeding despite the provisions of California Code of Civil Procedure § 1281.2(c).  I UNDERSTAND BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH I AND THE COMPANY GIVE UP OUR RIGHTS TO TRIAL BY JURY."[1]

The second of the three agreements was signed by the Davises on April 10.  (Agreement No. 2).  Agreement No. 2 is two pages, the first of which says at the top "Agreements" in capitalized boldface.  The two pages contain two paragraphs, the first of which is entitled "At Will Employment Agreement."  The second paragraph runs from page one over to page two and is entitled in boldface "Binding Arbitration Agreement."

---

[1]  As to the first two of these sentences, we note that the referenced "CCP § 1284.2" is nowhere referred to earlier and the reference is, to say the least, confusing.  So too is the reference to "Federal Arbitration Act (9 U.S.C. §§ 3–4)," as those sections have nothing to do with the rules or procedures that would govern an arbitration:  section 3 states that a trial will be stayed pending arbitration; section 4 permits a party to petition the court to order arbitration if the other party refuses to arbitrate.  And to add even more confusion, the paragraph references the "Act" throughout, but "Act" is not defined anywhere, and it is unclear if the word "Act" refers to the Federal Arbitration Act, the California Arbitration Act, or some other statute.

And what a paragraph it is:  67 lines long, without any indentation, included within which is a sentence that is 15 lines long.[2]

The third Agreement, also dated April 10, is entitled "Employee Acknowledgement and Agreement" (Agreement No. 3).  Agreement No. 3 is two pages long, and consists of six paragraphs, the first of which acknowledges that the employee has "received a copy of the Employee Handbook and . . . will familiarize myself with its contents."  The arbitration provision is in the third of the six paragraphs, which paragraph is 49 lines long and includes the same 15-line sentence in Agreement No 2.  And the 49-line paragraph ends with the penultimate—and confusing—sentence in Agreement No. 1.

As indicated, nowhere in its briefing does TWC quote the entirety of any of the three agreements.  What it does say, citing to 19 pages in the Clerk's Transcript, is this: "Each of these agreements signed by each respondent expressly provides:  I and the Company both agree that any claim, dispute, and/or controversy that either party may have against one another . . . which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (or its

---

[2]  The sentence reads as follows:  "Because of the mutual benefits (such as reduced expense and increased efficiency) which private binding arbitration can provide both the Company and myself, I and the Company both agree that any claim, dispute, and/or controversy that either party may have against one another (including, but not limited to, any claims of discrimination and harassment, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, as well as all other applicable state or federal laws or regulations) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (or its owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, and Employment Development Department claims) shall be submitted to and determined exclusively by binding arbitration."

owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, . . . shall be submitted to and determined exclusively by binding arbitration. . . . I agree that the arbitration and this Agreement shall be controlled by the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act. . . ."

We cannot help but observe the four ellipses in TWC's quotation—and observe further TWC's lack of candor, given how much the quotation misrepresents the Agreements here. Using Agreement No. 3 for comparison, the first and second ellipses each omit three lines, the third ellipsis seven lines, and the last ellipsis 24 lines—38 lines. Thirty-eight lines omitted from a 49-line paragraph, a paragraph that, as will be discussed in detail below, our Supreme Court has recently described as a "paragon of prolixity," whose substance is "opaque," and which has sentences that are "complex, filled with statutory references, and legal jargon." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 128) (*Kho*).) That is what the ellipses leave out. TWC's conduct is not to be condoned.

Sometime after the Davises became employed, TWC hired a new General Manager, Ralph Colon. As the Davises describe it, Colon "began to systematically undermine [the Davises's] programs," an effort "punctuated by shockingly inappropriate ageist and racist comments to and about them." The Davises attempted to address the issue with TWC, to no avail. They resigned, filed complaints with the Department of Fair Employment and Housing, and obtained right to sue letters. And sued.

4

**The Proceedings Below**

On February 1, 2018, the Davises filed a complaint naming three defendants: TWC, John Schafer, alleged to be its owner, and Colon. The complaint alleged sixteen causes of action related to their employment at TWC.[3]

On March 26, TWC, Schafer, and Colon (for convenience, TWC) filed a petition to compel arbitration and stay proceedings. The petition attached copies of the agreements signed by each of the Davises, and was accompanied by a declaration of TWC controller Bonnie Guest, who testified that the three signed agreements were in each of the three Davises' personnel files. As Guest also testified, TWC's "company policy . . . requires all personnel to participate in its dispute resolution program," going on to testify that "[t]here are no employees of [TWC] who are not required to agree to the dispute resolution provisions, which require binding, individual arbitration of disputes arising out of the employment." As she summed it up: "All personnel who commence or continue employment with [TWC] are required to comply with the alternative dispute resolution policy, which includes the mandatory arbitration of employment-related claims. This dispute resolution policy is set forth in written agreements throughout the employment of each individual[]."

The Davises filed opposition to the petition, which opposition did not include any declaration.

TWC filed a reply, and the Davises a sur-reply, the latter accompanied by a declaration of Jennifer Lucas, their attorney, which declaration said nothing about the circumstances surrounding the signing of the agreements.

---

[3] The causes of action were: (1) race discrimination; (2) age discrimination; (3) retaliation; (4) hostile work environment; (5) failure to prevent discrimination and harassment; (6) negligent hiring, supervision and/or retention; (7) wrongful termination in violation of public policy; (8) breach of contract; (9) non-payment of wages, vacation, overtime and/or double time wages; (10) failure to provide meal/rest periods; (11) failure to keep adequate time records; (12) pay stub violations; (13) unfair business practices; (14) failure to reimburse work-related expenses; (15) waiting time penalties; and (16) failure to provide employment records.

5

The petition came on for hearing on May 10, prior to which the court had issued a tentative ruling denying the petition. The hearing was brief, most of it being argument by counsel for TWC, and questions by the court to him. Among other things the court questioned TWC's counsel about the adhesive nature of the agreements, and also asked "what about *Iskanian*?," referring to *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348. At the conclusion of the hearing the court took the matter under submission.

On July 20, the court issued its order denying the petition. The order was a comprehensive 11 pages that first determined there was an agreement to arbitrate, specifically Agreement No. 2 read in conjunction with Agreement No. 3. The court went on to find both procedural and substantive unconscionability, finding among other things that "Agreements [No.] 2 and [No.] 3 are contracts of adhesion drafted by [TWC], and signed by [the Davises] on a 'take-it-or-leave-it' [basis]." And this: "Adding to the oppressive element of procedural unconscionability, is surprise resulting from the [Davises'] apparent inability to determine which of the three arbitration contracts and which of the provisions contained therein apply. [The Davises] complain that none of the three agreements are identical and their terms are contradicting. The Court agrees that some of the provisions in the agreements are inconsistent and that some are substantively dubious. Notably, while Agreement [No.] 2 clearly states that the right to a jury trial would be waived, Agreement [No.] 3 entirely omits this important clarification. Confusing characteristics like these weigh in favor of a finding of procedural unconscionability. (*Samaniego v. Empire Today LLC* (2012) 205 Cal.App.4th 1138, 1146.)"

On August 8, TWC filed a notice of appeal.

**DISCUSSION**

**The General Law**

In the seminal case of *Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*), our Supreme Court addressed the validity of an arbitration agreement signed by employees, and held that the agreement was contrary to

6

public policy and unlawful.  In the course of doing so, the Court discussed the "judicially created" doctrine of unconscionability, which, the Court held, has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.  And the Court went on, both procedural and substantive unconscionability must both be present in order for a court to refuse to enforce a contract under the doctrine of unconscionability.  "But they need not be present in the same degree. . . .  In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  (*Id.* at p. 114.)

Here, as noted, the trial court found both procedural and substantive unconscionability, based on a record that included only the declaration of TWC controller Guest and the Davises' attorney Lucas, whose declaration, as noted, testified to nothing about the signing of the agreements.  In short, the evidence was not in conflict, and our review is a question of law subject to de novo review.  (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*); *Subcontracting Concepts (CT), LLC v. De Melo* (2019) 34 Cal.App.5th 201, 208 (*De Melo*).)

### Any Arbitration Agreement was Unconscionable, Both Procedurally and Substantively[4]

***Introduction to the Analysis***

TWC's opening brief begins with an "Introduction," the second paragraph of which says that "It is almost unbelievable that this issue even has to come for appeal.  At

---

[4]  It is not clear what TWC contends is (are) the controlling agreement(s) to arbitrate, as neither below, nor here, does it say.  As noted, the trial court found an agreement to arbitrate based on a combination of Agreements 2 and 3, which the Davises assert was error.  TWC responds that, not having filed a cross-appeal, the Davises cannot assert this claim of error.  We do not understand TWC's position, not in light of the de novo standard of review.  That said, we proceed on the basis there was an agreement to arbitrate.

7

issue here is the enforceability of an arbitration provision identical in all material terms to arbitration provisions that have been routinely enforced by appellate courts, *including* the state Supreme Court."

Such hyperbole has no place here. And the "identical in all material terms" representation is never even attempted by TWC, let alone shown.

Following its introduction and claimed statements of facts, TWC argues that the trial court erred in both of its unconscionability determinations, both procedural and substantive. Doing so, TWC makes one substantive argument, which argument has four sub-arguments, three addressing procedural unconscionability, one addressing substantive unconscionability. The arguments are as follows:

"The level of procedural unconscionability here is minute, if extant at all; the record does not support a finding of adhesion.

"The evidence does not support that this agreement was presented on a take-it-or-leave-it basis.

"[The Davises'] apparent failure to exercise reasonable diligence in agreeing to the arbitration agreement does not fulfill the surprise element.

"The Superior Court erred in determining that the modification provision rendered the arbitration agreement substantively unconscionable."

TWC is wrong on all counts.

### *Procedural Unconscionability*

As *Armendariz* put it, "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion. [Citation.] 'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.] If the contract is adhesive, the court must then determine whether 'other factors are present which, under established legal rules— legislative or judicial—operate to render in [unenforceable].' [Citation.]" (*Armendariz, supra*, 24 Cal.4th at p. 113; accord, *De Melo, supra*, 35 Cal.App.5th at p. 210.)

8

As the Supreme Court has also said, procedural unconscionability focuses on the elements of oppression and surprise. (*Pinnacle*, *supra*, 55 Cal.4th at p. 247.) Oppression " ' " ' "arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. . . . Surprise involves the extent to which the terms of the bargain are hidden in a 'prolix printed form' drafted by a party is a superior bargaining position. " ' " ' " (*Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 703.)

TWC's opening brief, filed on May 13, 2019, asserts that any procedural unconscionability here is "minute, if extant at all"; its reply brief, filed two months later, describes a "minimal degree of procedural unconscionability." We are dumbfounded. As to why, we note first the comments by our colleagues in Division One, in their decision in *OTO, L.L.C. v. Kho* (2017) 14 Cal.App.5th 691. This was a case against another Toyota dealer, this one in Oakland—represented, not incidentally, by the same firm that represents TWC here: Fine, Boggs & Perkins, LLC, Half Moon Bay (Fine, Boggs). It involved an arbitration provision that was virtually identical (if not identical) to that involved here, as to which Division One found procedural unconscionability that was "extraordinarily high," saying this: "Written in a single block, without paragraphs to delineate different topics, the arbitration clause is visually impenetrable. Because the entire Agreement occupies less than two pages, there was no practical need for One Toyota to choose a small typeface. Yet the font chosen is so small as to challenge the limits of legibility. Further, the language is legalistic, and the text is complex. The second sentence of the arbitration clause manages to occupy 11 lines of text, notwithstanding the tiny typeface. Some of the language, such as the reference to Code of Civil Procedure section 1284.2, requires a specialist's legal training to understand. It cannot be said that One Toyota was attempting to hide the ball by burying the arbitration clause in an otherwise prolix agreement, since the Agreement consists almost entirely of the arbitration clause. Yet the Agreement is drafted and composed in a manner, again, to thwart rather than promote understanding. For these reasons, we conclude that the degree

9

of procedural unconscionability was extraordinarily high." (*OTO L.L.C. v. Kho*, *supra*, 14 Cal.App.5th at pp. 708–709.)

Were that not enough, the recent Supreme Court opinion in *Kho, supra,* 8 Cal.5th 111 is devastating. OTO, another Toyota dealership, filed a petition to compel arbitration based, as noted, on an arbitration agreement virtually identical to that here.[5] The trial court found "a high degree of procedural unconscionability" (*id.* at p. 120), also found substantive unconscionability, and denied the petition. OTO appealed, where, as quoted, the Court of Appeal found procedural unconscionability, but nevertheless reversed, finding no substantive unconscionability. The Supreme Court reversed the Court of Appeal. And commenting on the language virtually identical to that here, the Supreme Court held that the facts supported the trial court's finding of "surprise," with this vivid description of why:

"The agreement is a paragon of prolixity, only slightly more than a page long but written in an extremely small font. The single dense paragraph covering arbitration requires 51 lines. As the Court of Appeal noted, the text is 'visually impenetrable' and 'challenge[s] the limits of legibility.' [¶] The substance of the agreement is similarly opaque. The sentences are complex, filled with statutory references and legal jargon. The second sentence alone is 12 lines long. The arbitration paragraph refers to: the California Fair Employment and Housing Act; title VII of the Civil Rights Act of 1964; other unspecified 'local, state or federal laws or regulations'; the National Labor Relations Act; the California Workers' Compensation Act; 'California Small Claims' actions; the Department of Fair Employment and Housing; the Employment Development Department; the 'Equal Opportunity Commission', the federal and California arbitration acts; and six different sections of California's Civil Code and Code

---

[5] The entire agreement is not quoted in either decision, so is it is difficult to know just how close to identical the language there is to Agreements No. 2 and No. 3 here in which the second sentences are also 12 lines long, and the various laws referred to in *Kho* (except for the reference to "small claims actions") are also present.

of Civil Procedure. A layperson trying to navigate this block text, printed in tiny font, would not have an easy journey."[6] (*Kho*, *supra*, 8 Cal.5th at p. 128.)

In light of all that, TWC's use of adjectives "minute" and "minimal" is myopic.

TWC's second sub-argument is that there is no evidentiary support for the "take-it-or-leave-it" conclusion by the trial court, its reply brief arguing that the court erred in "determining the . . . agreements were contracts of adhesion." In claimed support, TWC cites to the testimony of its controller Guest, which, TWC asserts, "establishes that all employees are required to agree to binding arbitration." Indeed they are, and we do not understand how that testimony advances TWC's position, especially in light of all of Guest's testimony quoted above, including that "[t]here are no employees of [TWC] who are not required to agree to the dispute resolution provisions, which require binding, individual arbitration of disputes arising out of the employment."

Not only that, but the setting is a classic for "take-it-or-leave-it" pressure, as noted in *Armendariz*, *supra*, 24 Cal.4th at p. 115: "[T]he economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (Accord, *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071.)

TWC's final sub-argument on procedural unconscionability is "[the Davises'] failure to exercise reasonable diligence in agreeing to the arbitration agreement does not fulfill the surprise element." Not only do the cases cited have nothing to due with any claimed failure to "exercise reasonable care," the complete answer is found in *Kho*: "[T]he facts . . . support the trial court's finding of surprise." (*Kho*, *supra*, 8 Cal.5th at p. 128.)

We turn to TWC's last sub-argument, addressing substantive unconscionability.

---

[6] The Supreme Court's introduction described the agreement in *Kho* as involving "an unusually high degree of procedural unconscionability." (*Kho*, *supra*, 8 Cal.5th at p. 118.)

*Substantive Unconscionability*

Citing numerous cases, *Kho* well defined substantive unconscionability:

"Substantive unconscionability examines the fairness of a contract's terms. This analysis 'ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation] or "unfairly one-sided" [citation.] All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party." " [Citation.] Unconscionable terms ' "impair the integrity of the bargaining process or otherwise contravene the public interest or public policy" ' or attempt to impermissibly alter the fundamental legal duties. [Citation.] They may include fine-print terms, unreasonably or unexpectedly harsh terms regarding price or other central aspects of the transaction, and terms that undermine the nondrafting party's reasonable expectations. [Citations.] These examples are illustrative, not exhaustive.

"Substantive terms that, in the abstract, might not support an unconscionability finding take on greater weight when imposed by a procedure that is demonstrably oppressive. Although procedural unconscionability alone does not invalidate a contract, its existence requires courts to closely scrutinize the substantive terms 'to ensure they are not manifestly unfair or one-sided.' " (*Kho*, *supra*, 8 Cal.5th at p. 130.)

And *Kho* confirmed, "given the substantial procedural unconscionability here, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." (*Kho*, *supra*, 8 Cal.5th at pp. 129–130.)

There is more than a low degree of substantive unconscionability here. Much more. Four illustrations should suffice.

First, using *Kho*'s words, we note the "fine-print terms" here, terms the Court of Appeal described as "so small as to challenge the limits of legibility."

Second, there is what can be argued to be a lack of mutuality, illustrated by the fact that the agreement was signed only by the Davises, not by anyone at TWC.

(*Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 86 ["Nowhere do the car wash companies indicate they were bound by the clause"].) But even assuming TWC were bound, Agreement No. 3 provides that "[t]he Company retains the right to add, change or delete wages, benefits, policies and all other working conditions at any time (except the policy of 'at-will employment' and Arbitration Agreement, which may not be changed, altered, revised or modified without a writing signed by the President of the Company)," a provision the trial court found substantively unconscionable. In other words, TWC has the unilateral right to change or modify the agreement at any time, and without notice to the Davises. (See generally *Peleg v. Neiman Marcus Group, Inc.* (2012) 204 Cal.App.4th 1425, 1463–1465.)

Third is the mere existence of the three separate agreements to arbitrate, a circumstance the trial court found confusing. Moreover, each of the three agreements has problems within itself, as we earlier noted: the referenced "CCP § 1284.2" is nowhere referred to earlier and thus confusing, as is the reference to the "Federal Arbitration Act (9 U.S.C. §§ 3–4)," as the sections have nothing to do with the rules or procedures that would govern arbitration. And the agreements refer to the "Act" throughout, but "Act" is not defined anywhere.

In addition to the internal confusion, the three agreements contain several inconsistencies, if not downright contradictions. For example, Agreement No. 2 has a provision precluding any class, collective, or joint action lawsuit, a provision that does not appear in Agreements No. 1 or No. 3. Agreement No. 2 also contains a statement precluding TWC from retaliating against the signer for "exercising [his or her] rights under section 7 of the National Labor Relations Act," a provision not in Agreements No. 1 and No. 3. And Agreement No. 2 further provides that the arbitrator has the exclusive authority (to the exclusion of a federal, state, or local court) to resolve disputes relating to the interpretation and enforceability of the agreement, another provision not in Agreement No. 1 or No. 3. Agreements No. 1 and No. 2 contain an express waiver of the right to jury trial; Agreement No. 3 has no such provision. Agreement No. 3 contains an "integration clause," stating it contains all representations between the parties regarding

13

dispute resolution, and that it supersedes differing terms from "prior" agreements, and yet it is impossible to tell whether the terms of Agreement No. 3 supersede Agreement No. 2 since Agreements No. 2 and No. 3 are both signed April 10.

Fourth is the presence of provisions that: (1) "the arbitrator will hear only . . . individual claims and does not have the authority to fashion a proceeding as a class or collective action . . .", and (2) "the Company has the right to defeat any attempt by [the Davises] to file or join other employees in a class, collective or joint action or arbitration . . . ." Such broad language could be read to preclude PAGA representative actions, a violation of public policy.

We recently addressed this identical issue in *De Melo*, *supra*, 34 Cal.App.5th 201, where the arbitration provision provided among other things that neither the employee nor the employer " 'shall be entitled to join or consolidate claims in arbitration by or against other individuals or entities, or arbitrate any claim as a representative member of a class or in a private attorney general capacity.' " (*Id.* at p. 205.) The trial court denied the employer's petition to compel, finding that the arbitration provision was procedurally and substantively unconscionable. We affirmed, including with reference to several reasons why the arbitration process was substantively unconscionable, one of which was this: "Fourth, the clause improperly bars respondent from arbitrating any PAGA claims. Our Supreme Court has held that 'an employee's right to bring a PAGA action is unwaivable.' (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 383), citing [Lab. Code] §§ 2699, 2699.3.) As the court explained, 'an agreement by employees to waive their right to bring a PAGA action serves to disable one of the primary mechanisms for enforcing the Labor Code. Because such an agreement has as its "object, . . . indirectly, to exempt [the employer] from responsibility for [its] own . . . violation of law," it is against public policy and may not be enforced. (Civ. Code, § 1668.)' (*Iskanian*, at p. 383.)" (*De Melo* at pp. 213–214.)

**A Closing Observation**

As indicated, the briefing in the case concluded in July 2019; shortly thereafter, *Kho* was filed, on August 29. We heard nothing from counsel, and so five days before

14

oral argument our clerk's office sent a letter to counsel advising that they should be familiar with *Kho*. The letter also additionally advised that "counsel for appellants should be prepared to address the following two facts: (1) that the quotation in their opening brief of the arbitration provision (see AOB 13–14) omits via ellipsis 38 of the 49 lines in the actual provision. (See Eisenberg, et al., Cal Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶ 9:27, p. 9–8); and (2) that they did not advise the Court of *Kho*. (See *Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 82, fn. 9. . . )."

We held oral argument, at which the attorney appearing for TWC was an associate at the Long Beach office of Fine, Boggs whose name did not appear on the briefs. Neither of the two attorneys on the briefs (or the papers below) appeared. We asked counsel the questions in our letter, who had no answer to the first question about the inaccurate quotation of the arbitration provision, stating that he did not even talk to the attorney who had signed the briefs, who, he said, was no longer at the firm.

As to the second question, counsel said that the firm did not advise us of *Kho* because the case was "different," this despite its extensive discussion of unconscionability, particularly procedural unconscionability, the issue on point here. Amazingly, when we pressed counsel on the issue, he said he had not even read the footnote in *Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65 (*Batt*), despite our express reference to it in our letter.

*Batt* involved taxpayer standing, and appellant's briefs failed to refer to several cases that were clearly pertinent to the issues, including even in her reply brief after the City's brief had pointed out appellant's failure. This led to the lengthy footnote we cited to counsel, which, referring to the then-extant Rules of Professional Conduct, read as follows:

"This concluding reference to *Neecke*[ *v. City of Mill Valley* (1995)] 39 Cal.App.4th 946 [(*Neecke)*], the last of many references in this opinion, reminds us to comment on the observation in the City's brief criticizing the advocacy of plaintiff's counsel, specifically their failure to even mention four cases the City describes as

15

'squarely on point with the issues in this appeal' and all of which 'were discussed . . . in [the City's] briefs to the trial court.' . . . Whether the cases are 'on point,' as the City would have it, they clearly are pertinent to any meaningful discussion of the issue here, as shown by the fact that the cases are collectively mentioned over 15 times in this opinion. Especially is this true of *Neecke*, which is not only a decision of this very court, but which detailedly discussed and dissected *Woosley*[ *v. State of California* (1992) 3 Cal.4th 758]. We believe the City's criticism is well taken.

"The California Rules of Professional Conduct provide that in presenting a matter to a court 'an attorney must employ, for the purpose of maintaining the causes confided to the attorney, only those means consistent with the truth. (Rules of Professional Conduct, rule 5-200(A).) . . . Thus, an attorney must not do any of the following: [¶] . . . Seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law. (Rules of Professional Conduct, rule 5-200(B).)' (1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 521, p. 621.)"

Our footnote went on to observe: "While Rules of Professional Conduct, rule 5-200 is perhaps applicable only by interpretation, the model rules of conduct adopted by the American Bar Association have a section that needs no interpretation," going on to cite, and quote, Rule 3.3, entitled "Candor Toward the Tribunal." (*Batt, supra,* 155 Cal.App.4th at pp. 82–83, fn. 9.)

That was the setting in 2007.

In 2018, our Supreme Court approved a comprehensive revision of the California Rules of Professional Conduct, effective November 1, 2018. The new rules replace the former rules, and implement a decimal numbering and organizational system based on the A.B.A. Model Rules of Professional Conduct. As pertinent here, this revision includes new rule 3.3, "Candor Toward the Tribunal," which provides in pertinent part as follows: " 'A lawyer shall not [¶] . . . [¶] (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel or knowingly misquote to a tribunal the language of a book, statute, decision or other authority. . . .' "

16

It is hard to imagine legal authority more "directly adverse to the position of" TWC than *Kho—* hard to imagine a more obvious violation of Rule 3.3.

## DISPOSITION

The order is affirmed.  The Davises shall recover their costs on appeal.

_____

Richman, J.

We concur:


_____

Kline, P.J.


_____

Miller, J.

*Davis v. TWC Dealer Group, Inc.* (A155030)

18

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Steven Austin |
| Attorney for Plaintiffs and Respondents: | Ferber Law, APC, Jonathan R. Babione, Jennifer Lucas, Connor M. Day; |
| Attorney for Defendants and Appellants: | Fine, Boggs & Perkins, John Boggs, Roman Zhuk, David Reese. |